**Judd GREGG, U.S. Congressman, et al., Appellants**

v.

**William J. BARRETT, individually and in his official capacity as Acting Public Printer, et al.**

**No. 84–5458.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 15, 1985.

Decided Sept. 13, 1985.

As Amended Oct. 8, 1985.

Maxwell A. Miller, Denver, Colo., with whom Michael R. Perna, Denver, Colo., was on brief, for appellants.

Charles Tiefer, Asst. Gen. Counsel to the Clerk, U.S. House of Representatives, Washington, D.C., with whom Steven R. Ross, Gen. Counsel to the Clerk, Michael Davidson, Senate Legal Counsel, M. Elizabeth Culbreth, Deputy Senate Legal Counsel and Morgan J. Frankel, Asst. Senate Legal Counsel, United States Senate, Washington, D.C., were on the brief for appellees Congressional.

Robert C. Seldon, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth, R. Craig Lawrence and Michael J. Ryan, Asst. U.S. Attys., Washington, D.C., were on brief for appellee Public Printer.

Before MIKVA and EDWARDS, Circuit Judges, and McGOWAN, Senior Circuit Judge.

MIKVA, Circuit Judge:

Appellants, who are Members of Congress, lawyers and academicians, ask this court to address their contention that the Congressional Record is not properly prepared by the responsible officials of the Congress. The District Court dismissed the complaint brought by appellants on the ground that the Speech or Debate Clause of Art. I, § 6 of the United States Constitution precluded any jurisdiction to hear the complaint. We affirm the dismissal of the complaint, albeit on different but related grounds.

## I. BACKGROUND

Appellants are Congressmen Judd Gregg, Manuel Lujan and Robert Walker, as well as Wilbur Nelson, Larry Westberg, and Thomas McCabe, all practicing members of the Idaho Bar, and Robert Burnside, a reference librarian at the University of California at Davis School of Law, and N. David Bleisch, a Boston College Law School student and member of the editorial staff of the Boston College Environmental Affairs Law Review. The appellees include William J. Barrett, Acting Public Printer, G. Russell Walker, Editor-in-Chief of Official Reports of Debates of the United States Senate, Geradine Lyda, Director of the Office of Official Reporters of the United States House of Representatives, and Congressman Augustus Hawkins and Senator Charles Mathias, Jr., Chair and Vice-Chair, respectively, of the Joint Committee on Printing of the United States Congress.

The gist of the complaint is that the Congressional Record is not a faithful transcript of what actually is said on the floor of the House and of the Senate. All of the appellants claim that the first amendment warrants their claim. The congressional appellants, for example, insist that they have a constitutional right to transmit an "accurate" report of congressional proceedings to their constituents, and that it is equally important that they receive an accurate transcript so that they can perform their congressional duties. The lawyer appellants claim that they need an accurate record to serve as the legislative history of statutes passed by the Congress.

Although Art. I, § 5, cl. 3 of the United States Constitution requires that "Each House shall keep a Journal of its Proceed-

ings, and from time to time publish the same," these official journals are abbreviated versions of congressional proceedings, recording only major acts taken by the respective Houses. They are separate and distinct from the Congressional Record, the document involved in this action. Prior to 1846, debates in Congress were not officially reported. Private publications, such as the National Intelligencer, the Register of Debates, and the Congressional Globe, however, began regularly publishing partial texts of debates. *See* 126 Cong.Rec. 18775, 18776 (1980) (statement of Sen. Byrd) (historical address); McPherson, Reporting the Debates of Congress, 28 Q.J. Speech 141, 142–46 (1942).

The transition to official publication began in 1846, when the Senate authorized each member to subscribe for twelve copies of the Congressional Globe; the House followed suit in 1847. The two Houses attempted to contract with private printers to transcribe all debates and to furnish those debates to the Congressional Globe to publish. When these contracts failed, the Government Printing Office took on the responsibility for publishing the Congressional Record, and the House and Senate hired reporters to transcribe their debates. *See* McPherson, *supra*, at 148.

Appellants claim that Congress committed itself to publishing an "accurate" Record, and cite the congressional declaration that: "The Joint Committee on Printing shall control the arrangement and style of the Congressional Record, and while providing that *it shall be a substantially verbatim report of proceedings*, shall take all needed action for the reduction of unnecessary bulk." Act of January 12, 1895, ch. 23, § 13, 28 Stat. 603, codified in 44 U.S.C. § 901 (1982) (emphasis added). Appellants point to other internal rules designed to create an accurate Record; among these is the "bullet rule," which provides: "Only as an aid in distinguishing the manner of delivery in order to contribute to the historical accuracy of the Record, statements or insertions in the Record where no part of them was spoken will be preceded and followed by a 'bullet' symbol...." *Laws and*

*Rules of Publication of the Congressional Record,* 130 Cong.Rec.App. (daily ed. Feb. 27, 1984).

The thrust of appellants' complaint is that these rules governing the accuracy of the Record are routinely broken by individual members of Congress. Appellants attached to their complaint a copy of an article by James Nathan Miller, *Congress's License to Lie,* Reader's Digest, Feb. 1983, at 72, written as an open letter to Congress, which details examples of alleged distortion of the Record. A single example from this article captures the sense of appellants' complaint:

> The courts and federal agencies can also be deceived by the counterfeiting of the *Record.* Observe the issue of last August 19, the day Congress voted for a $98-billion tax increase in 1983. The transcript contains a seemingly impossible phenomenon: seven full pages of floor speeches (about 10,000 words) apparently delivered just before the vote on the floor of the House in a single ten-minute period. Yet there are no bullets in the *Record* to indicate that any of these speeches were not delivered on the floor.
>
> How was the trick accomplished? Each Congressman just used his revise privilege, which allowed him to go back to his office and insert a speech into the *Record* so that it appears to have been delivered just *before* the vote.
>
> What difference does this make? This year, when the courts and the IRS interpret the language of the new tax act, they'll look up the act's "legislative history," which includes transcripts of debate supposed to show what Congress had in mind when it put particular words in the law. How then to distinguish true debate from pages of remarks added later? They'll just have to guess.

*Id.* at 82–83.

## II. Analysis

We offer neither criticism nor defense of the congressional practice. Like the philos-

·ophy of the Speech or Debate Clause used by the District Court, Gregg v. Barrett, 594 F.Supp. 108 (D.D.C.1984), to reject appellants' claims, our analysis precludes this Court from reviewing congressional practices and procedures when they primarily and directly affect the way Congress does its legislative business.

A. *The Speech or Debate Clause*

A number of opinions have advanced the proposition that the Speech or Debate Clause protects the publication of materials inserted into the Record but never spoken on the floor. *See, e.g., Hutchinson v. Proxmire,* 443 U.S. 111, 116 n. 3, 99 S.Ct. 2675, 2678 n. 3, 61 L.Ed.2d 411 (1979) ("we assume, without deciding, that a speech printed in the Congressional Record carries immunity under the Speech or Debate Clause as though delivered on the floor."); *Miller v. Transamerican Press, Inc.,* 709 F.2d 524, 529 (9th Cir.1983) (holding that insertion of material into Record is protected by Speech or Debate Clause and that, as a consequence, congressman could invoke privilege to avoid answering questions during deposition); *Rusack v. Harsha,* 470 F.Supp. 285, 296 n. 18 (M.D.Pa.1978) (holding that Speech or Debate Clause protects congressman from defamation suit based on insertion of material into Record); *Hentoff v. Ichord,* 318 F.Supp. 1175, 1179 (D.D. C.1970) (holding that Speech or Debate Clause forbids issuance of injunction to prevent publication in Record of Committee Report); *Straus v. Gilbert,* 293 F.Supp. 214, 216 (S.D.N.Y.1968) (holding that congressman could use franking privilege on all materials inserted in the Record, even materials for purposes of campaigns: "this court does not, and cannot, tell Congress what it can print in its Journal."); *McGovern v. Martz,* 182 F.Supp. 343, 347 (D.D.C.1960) (holding that Speech or Debate Clause immunizes insertion of materials into Record from action for defamation).

Our difficulties with applying this clause to the case *sub judice* have to do more with fit than philosophy. There is little doubt that the primary purpose of the Speech or Debate Clause was to insulate Members of Congress from any legal accounting for their legislative communications. In his opinion for the Court in *United States v. Johnson,* 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966), Mr. Justice Harlan canvassed the history of the Speech or Debate Clause from its British common law origins to the American constitutional system. From its earliest formulation, Justice Harlan observed,

[the Speech or Debate Clause] was the culmination of a long struggle for parliamentary supremacy. Behind these simple phrases lies a history of conflict between the Commons and the Tudor or Stuart monarchs during which successive monarchs utilized the criminal and civil law to suppress and intimidate critical legislators. Since the Glorious Revolution in Britain, and throughout United States history, the privilege has been recognized as an important protection of the independence and integrity of the legislature.

*Id.* at 178, 86 S.Ct. at 754. Our constitutionalists were convinced that regular and frequent elections would hold members of Congress to all the accountability that was necessary for their legislative actions; the British history of punitive and vengeful executives persuaded them that an untrammeled legislature was the touchstone of this form of government.

In sum, we have no doubt that if appellants had raised the question at Independence Hall, the Constitutional Convention would not have authorized judicial review for accuracy of the records of legislative speeches and debates. The difficulty with applying the Speech or Debate strictures to this complaint is that the challenge is not to the legislative independence of any individual members of Congress. Nor does the challenge threaten speech or debate itself. Indeed, appellants insist that they are faithful to the notion of free debate and speech, and that accuracy of record is a help to that notion. They argue that no member's independence is jeopardized by the suit. How can an accurate accounting of what was said do anything but enhance

the implementation of the Speech or Debate Clause?

We need not address this beguiling conundrum because there are good and sufficient—and prefatory—reasons why the suit must fail. The concerns that led to adoption of the Speech or Debate Clause deal not only with the independence of individual legislators; those same concerns ordained an independent legislature, a Congress not subject to general oversight by either the executive or judicial branches of government.

## B. *Equitable Discretion*

The doctrine of separation-of-powers has been difficult to describe and maintain because the concept is so easily overstated. Obviously the Congress, the courts and the executive branch are not truly separate, constitutional repellants that must never touch or acknowledge each others' existence. Every action of Congress triggers subsequent actions by the other branches. The essence of separation, then, is in the operation end of the business.

It is in that very piece of the structure that individual members of Congress seek to vent their frustration with their colleagues, or with the executive branch, or both, by appeals to the courts. It has become a growing phenomenon to see individual members of Congress challenge actions or failures to act as violations of the members' interests as legislators. A great upsurge in this type of lawsuit began during the Vietnam War era, when members of Congress, frustrated with what they perceived as the failures of this country's Southeast Asian foreign and military policy, filed suit to declare unlawful various executive actions in pursuit of that policy. *See, e.g., Holtzman v. Schlesinger,* 484 F.2d 1307 (2d Cir.1973) (dismissing challenge to legality of bombing and other military activities in Cambodia as political question), *cert. denied,* 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974); *Drinan v. Nixon,* 364 F.Supp. 854 (D.Mass.1973) (action by legislators for declaratory and injunctive relief against military activities in Indochina dismissed as nonjusticiable); *Gravel v. Laird,* 347 F.Supp. 7 (D.D.C. 1972) (same). More recently, this type of lawsuit has been pursued in reaction to a wide range of executive and legislative decisions that left some individual legislators disgruntled and eager to attempt to reverse their fortunes via judicial intervention. This court alone has seen, in recent years, actions by legislators asking, for example, to declare a tax statute unconstitutional, *Moore v. U.S. House of Representatives,* 733 F.2d 946 (D.C.Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 779, 83 L.Ed.2d 775 (1985), to reallocate committee assignments within the House of Representatives, *Vander Jagt v. O'Neill,* 699 F.2d 1166 (D.C.Cir.1982), *cert. denied,* —— U.S. ——, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983), to continue the United States mutual defense treaty with Taiwan despite presidential action purportedly terminating it, *Goldwater v. Carter,* 617 F.2d 697 (D.C. Cir.) (en banc), *judgment vacated,* 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979), and to declare illegal certain Central Intelligence Agency activities, *Harrington v. Bush,* 553 F.2d 190 (D.C.Cir.1977).

The plethora of cases left the courts struggling to avoid conferring on individual legislators standing to challenge any legislative decision, a result that could breach the independence of the legislative branch. An important doctrine being shaped to meet this concern has been described under the rubric of remedial or equitable discretion. Our colleague Judge Carl McGowan has written the seminal article in the field. McGowan, *Congressmen in Court: The New Plaintiffs,* 15 Ga.L.Rev. 241 (1981). The article noted that these cases present serious separation-of-powers issues, especially in cases where the plaintiff "could have obtained from Congress the substantial equivalent of the judicial relief sought, because in such cases the court is asked to intrude into the internal functionings of the legislative branch itself." *Id.* at 242. For these purposes, however, Judge McGowan found the standing, political question, and ripeness doctrines "notoriously difficult to understand and to apply, and [failing] in

varying degrees to account for the underlying separation-of-powers concerns." *Id.* at 244. The solution in such cases, Judge McGowan's article suggested, was for the court to translate separation-of-powers concerns into practice by withholding injunctive or declaratory relief. *Id.* at 262.

This court openly embraced the remedial discretion doctrine in *Riegle v. Federal Open Market Committee,* 656 F.2d 873 (D.C.Cir.), *cert. denied,* 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 616 (1981). In *Riegle,* the court affirmed the dismissal of a senator's suit challenging the constitutionality of the Federal Reserve Act. Senator Riegle argued that the method by which members of the Federal Open Market Committee were elected, without the advice and consent of the Senate, violated his rights under the Appointments Clause of the United States Constitution. Although the court found that the senator had standing to sue, it adopted the McGowan article's thesis that the court should exercise its equitable discretion to dismiss the legislator's action. The court reasoned that the congressional plaintiff could clearly receive substantial relief from his congressional colleagues in the form of enactment of a new statute or repeal or amendment of the statute in question. *Id.* at 881. The court noted, in particular, that a bill which would have accomplished Senator Riegle's objectives had been introduced in Congress during the previous session. *Id.* at 882.

Although decided on grounds that the congressional plaintiff could obtain his objective by resort to the legislative process, *Riegle* also suggested that the potential lack of standing of private plaintiffs is a relevant inquiry in determining whether the exercise of remedial discretion is appropriate. Specifically, the court noted: "We would welcome congressional plaintiff actions involving non-frivolous claims of unconstitutional action which, because they could not be brought by a private plaintiff and are not subject to legislative redress, would go unreviewed unless brought by a legislative plaintiff." *Id.* Despite this apparent invitation, however, this court has never squarely held that, where private

plaintiffs are held to lack standing, an action by a congressional plaintiff may not be dismissed on prudential grounds. *See Committee for Monetary Reform v. Board of Governors of the Federal Reserve System,* 766 F.2d 538, 544 (D.C.Cir. 1985). The instant case does not squarely present the issue. Although we affirm the dismissal of the private plaintiffs' action in this case, we do so on grounds of lack of a cause of action, not lack of standing. *See* Part II(C), *infra.*

Since *Riegle,* the court has firmly established the doctrine of remedial discretion as the preferred method for coping with separation-of-powers concerns in suits by congressional plaintiffs where the ill in question could clearly be rectified by congressional action. In *Vander Jagt v. O'Neill,* 699 F.2d 1166 (D.C.Cir.1982), *cert. denied,* —— U.S. ——, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983), congressional plaintiffs sought a judicial determination that the committee appointments system employed by the House leadership was unconstitutional. This court, citing prudential concerns similar to those in *Riegle,* declined to interfere in the House's internal rules decisions. *Id.* at 1175. In *Crockett v. Reagan,* 558 F.Supp. 893 (D.D.C.1982), *aff'd,* 720 F.2d 1355 (D.C. Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984), the district court dismissed an action for declaratory judgment that actions of the President and Secretaries of Defense and State, in supplying military aid to El Salvador, violated, *inter alia,* the Foreign Assistance Act. That Act prohibits provision of security assistance to any country the government of which engages in a consistent pattern of gross violations of internationally recognized human rights. The district court declined to exercise its discretion to provide relief to the congressional plaintiffs since it was clear that plaintiffs' dispute was primarily with their fellow legislators, who had continued to authorize aid to El Salvador, despite continuing questions of human rights abuses. *Id.* at 902. This court affirmed the dismissal of this portion of the complaint on the basis of the

equitable discretion doctrine. *Crockett,* 720 F.2d at 1357. In *Moore v. U.S. House of Representatives,* 733 F.2d 946 (D.C.Cir. 1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 779, 83 L.Ed.2d 775 (1985), members of the House challenged the constitutionality of the Tax Equity and Fiscal Responsibility Act. This court affirmed dismissal of the complaint since the congressional plaintiffs could vindicate their rights by seeking repeal of the statute. *Id.* at 956.

As efficacious as the concept of remedial discretion has proven to be, it does not resolve all of the tensions caused in trying to maintain the powers of government as separate but still in the same orbit. In *Barnes v. Kline,* 759 F.2d 21 (D.C.Cir. 1985), individual members of the House, joined by the Senate and the Speaker and bi-partisan leadership of the House, challenged an attempted "pocket veto" by the President at the end of a legislative session. This court reversed the district court determination, on motion for summary judgment, that the veto was properly exercised. In reaching that determination, this court commented on why the doctrine of equitable discretion did not counsel dismissal of the lawsuit. The problem, as the court noted, was not that the individual legislators had failed to gain their ends in the legislative arena. Rather, Congress has passed an Act which the President refused to sign and declared not to be law, while bypassing the veto and override provisions of the Constitution. In short, the political branches had reached a "constitutional impasse" which required the invocation of judicial review. *Id.* at 20 (internal quotation marks omitted). The *Barnes* case thus confirms that the essential concern of the equitable discretion doctrine is that the court not interfere in matters which properly could, and should, be decided by appeal to one's fellow legislators.

The *Barnes* decision does not resolve all of the questions related to the exercise of remedial discretion—witness the 30 page dissent in that case. Particularly, it does not resolve the question of whether the presence of congressional leadership cast as plaintiffs always provides the necessary ingredient to command judicial review of the dispute—nor has it resolved the counterpart question of whether the *absence* of such a level of plaintiffs will always cause defeat of the suit. Whatever remaining conundrums, *Barnes* is a clear restatement of the doctrine, applicable to these congressional plaintiffs.

Basically, the congressional appellants seek a more accurate reporting of proceedings in the Record. There are at least two ways that the congressional appellants could achieve this end through resort to the legislative process. First, they could convince other members to insist on enforcement of existing rules. For example, appellants could monitor the Record for inaccuracies and request the consent of the House or Senate to strike out clearly inaccurate passages. The House Rules provide, for example, that in revising his speech, a member may not place a different aspect on the remarks of a colleague. House Rules § 928. A congressional plaintiff, concerned that his remarks or the remarks of a colleague had been distorted by another member in his written submissions to the Record, could move to have that portion of the Record stricken. *Id.* Second, as a more permanent solution, appellants could convince their congressional fellows to adopt a rule of verbatim accuracy, ending all controversy about the extent of permissible distortions of the Record. As the article on which the appellants largely base their claim puts it: "all [Congress] has to do is pass a resolution adopting the practice that has been followed by the Canadian and British parliaments for decades: all words spoken on the floor are recorded verbatim in the *Record.*" Miller, *Congress's License to Lie,* Reader's Digest, Feb. 1983, at 87. Similarly, the Advisory Committee on Automation has found that "[i]f, in the future, the leadership should desire a completely verbatim transcript such as is produced in a courtroom, it need only give the word and the changeover will be accomplished." Advisory Committee on Automation and Standardization of Congressional Publications, 95th Cong., 2d

Sess., Current Procedures and Production Processes of the Congressional Record 70–71 (Comm.Print 1978).

The court notes that, within the last few months, House Members, including the appellants, have sought and obtained some of the relief which the doctrine of equitable discretion leaves to Congress. After extensive and partisan debate, the House of Representatives agreed to H.Res. 230, the Accuracy in House Proceedings Resolution. 131 Cong.Rec. H6893–97 (daily ed. July 31, 1985). This resolution directs the Joint Committee on Printing to print in the Congressional Record a "substantially verbatim account of remarks actually spoken during the proceedings of the House" in typeface that is clearly distinguishable from the typeface used for "any remarks not actually spoken but inserted under permission to extend remarks." This rule will continue in force for the remainder of the first session of the current Ninety-ninth Congress, and the Committee on House Administration will then report to the House its findings and its recommendation as to whether the rule should be continued. By reaching a provisional political solution and expressly contemplating later evaluation and modification of that solution, Congress underscores the wisdom of this court's non-entanglement in the House's preparation of the Congressional Record.

■ Although the doctrine of remedial discretion clearly justifies dismissal of that portion of the complaint dealing with the congressional appellants, appellees would have the court go further and dismiss the private parties' claims on the same ground. The sole support for this position is the observation that in *Vander Jagt v. O'Neill*, 699 F.2d 1166 (D.C.Cir.1982), *cert. denied*, — U.S. —, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983), the congressional plaintiffs sued both in their capacity as legislators and as individual voters, *id.* at 1167 n. 1, and yet the court affirmed an order dismissing the complaint on the basis of equitable discretion. We find appellees' reliance on *Vander Jagt* misplaced. First, the plaintiffs in *Vander Jagt* were neither purely congres-

sional representatives nor purely private parties, but "some of both." *Id.* at 1175 n. 24. Thus, the court was not presented with the question of whether a suit by purely private plaintiffs would have been dismissed on equitable discretion grounds. Second, exercise of equitable discretion in *Vander Jagt* was not solely based on the availability to the plaintiffs of a remedy in the congressional arena. Rather, the court expended much energy in detailing the great potential for interference in the legislative process represented by judicial review of congressional committee assignment decisions. *Id.* at 1175–76. This concern for interference applies whether the plaintiff is a member of Congress or a private citizen. Third, appellees' reading of *Vander Jagt* conflicts with language in other opinions which suggests that an important reason to withhold equitable relief for congressional plaintiffs is the possibility that other, private plaintiffs may bring suit in a context less laden with separation-of-powers concerns. *See Moore v. U.S. House of Representatives*, 733 F.2d 946, 956 (D.C.Cir.1984) (noting that private taxpayers "have been found to have standing to challenge the constitutionality of TEFPA under the Origination Clause, so the issue will not go unresolved."), *cert. denied*, — U.S. —, 105 S.Ct. 779, 83 L.Ed. 775 (1985); *Riegle v. Fed. Open Mkt. Comm.*, 656 F.2d 873, 881 (D.C.Cir.) (noting that "one can easily conceive of a private plaintiff who could acquire standing to bring a similar claim."), *cert. denied*, 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 616 (1981). We think that *Vander Jagt* did not alter this portion of the court's equitable discretion doctrine. We turn, then, to the remainder of the class of plaintiffs, who are appellants in this court.

## C. *Failure to State a Cause of Action*

We affirm the order dismissing the complaint as to the private appellants on a more fundamental ground. There simply is no first amendment right to receive a verbatim transcript of the proceedings of Congress. That is, where a member of Congress instructs the Reporter and the

Public Printer to publish his remarks with certain revisions or omissions, the publication of these revised remarks does not interfere with the right of an audience to receive information from a "willing speaker." Thus, appellants have failed to state a cause of action. Fed.R.Civ.P. 12(b)(6).

For purposes of determining whether a plaintiff has failed to state a cause of action, the factual allegations of the complaint must be taken as true, and any ambiguities or doubts must be resolved in favor of the pleader. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). Despite this generous standard, "the complaint must set forth sufficient information to suggest that there exists *some* recognized legal theory upon which relief can be granted." *District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1081 (D.C.Cir.1984). A court must dismiss a complaint where, even assuming all the factual allegations are true, the plaintiff has failed to establish a right to relief based upon those facts.

■ The private appellants claim a right, under the first amendment to receive an undistorted transcript of congressional proceedings. (The congressional appellants also claim a right to transmit an undistorted transcript. Our determination, in Part II(B) of this opinion, to dismiss the claims of the congressional appellants on remedial discretion grounds avoids the need for discussion of this claim.) Appellants rely on a series of Supreme Court opinions in which the Court has held that the government interferes with the right of an audience to receive information whenever it "contract[s] the spectrum of available knowledge." *Griswold v. Connecticut*, 381 U.S. 479, 482, 85 S.Ct. 1678, 1680, 14 L.Ed.2d 510 (1965). Thus, for example, the Court has held that the right to receive information is implicated when a school board orders the removal of books from a school library, *Board of Educ., Island Trees Union Free School Dist. No. 26 v. Pico*, 457 U.S. 853, 866, 102 S.Ct. 2799, 2807, 73 L.Ed.2d 435 (1982) (plurality opinion), when a state prevents the dissemination of important information to consumers, *Virginia St. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 770, 96 S.Ct. 1817, 1829, 48 L.Ed.2d 346 (1976), when the government forbids the participation of an alien at academic conferences and discussions, *Kleindienst v. Mandel*, 408 U.S. 753, 765, 92 S.Ct. 2576, 2582, 33 L.Ed.2d 683 (1972), or when the state convicts an individual for mere possession of obscene material, *Stanley v. Georgia*, 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542 (1969).

The right to receive information, however, is not established in every case where a person wishes to receive information. In *Houchins v. KQED, Inc.*, 438 U.S. 1, 9, 98 S.Ct. 2588, 2598, 57 L.Ed.2d 553 (1978) and *Zemel v. Rusk*, 381 U.S. 1, 17, 85 S.Ct. 1271, 1281, 14 L.Ed.2d 179 (1965), for example, the Court refused to interpret the first amendment to require the government to provide access to information on demand. Rather, the Court has indicated that the right to receive information "presupposes a willing speaker." *Virginia Citizens Consumer Council, Inc.*, 425 U.S. at 756, 96 S.Ct. at 1822.

The member of Congress who makes a speech on the floor and later adds or omits material for inclusion in the Congressional Record certainly cannot be considered a "willing speaker" for appellants' purposes. Appellants would have many such additions or omissions corrected, clearly contrary to the wishes of the individual speaker. Instead, appellants propose two other theories of the identity of the "willing speaker" in this case. First, appellants suggest that Congress as an institution is committed to the publication of an accurate Record, as evidenced by its adoption of rules requiring accurate reporting. Second, appellants suggest that members of Congress who wish to transmit an accurate legislative history are willing speakers whose goal is frustrated by distortions in the Record caused by the failure of the appellees to prevent excessive additions and omissions

548

caused, in turn, by other members. For us to accept either theory, however, would impermissibly expand the definition of a willing speaker to embrace countless situations where the Supreme Court's opinions clearly contemplated that it would not apply.

The fundamental flaw in appellants' first theory is that Congress as an institution is not a speaker at all under these circumstances. One might say that when Congress passes bills or resolutions, those documents "speak" the will of Congress, but here the subject is speaking legislative history. Views on the meaning of a legislative measure, except as embodied in a bill or resolution, are necessarily those of the individual speaker, not of the institution as a whole.

Even assuming that Congress can be considered a speaker in these circumstances, the interference with the speech of Congress, or, under appellants' second theory, the interference with the speech of the member who wishes to transmit an accurate record of his remarks in context, is so indirect that neither should be considered the willing speaker in this case. Rather, the willing speaker is the member who makes a speech and who wishes to revise or extend his remarks. The appellees' method of publishing the Congressional Record, of course, in no way interferes with that member's speech.

As compared to cases in which the Court has assumed the existence of a willing speaker, appellants' theory of the identity of a willing speaker in this case appears indirect. The government defendants in those cases sat directly astride the channel of communication, restricting the flow of information. In *Board of Educ., Island Trees Union Free School Dist. No. 26 v. Pico,* 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982), for example, the willing speakers were the authors of books in a school library, and the willing recipients the students in the school. The government interfered with this transfer of information directly, by removal of the books from the library. In *Virginia St. Bd. of*

*Pharmacy v. Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), the willing speakers were those licensed pharmacists who wished to advertise the prices of prescription drugs and the audience consisted of consumers of those drugs. The state directly interfered with this communication by banning prescription drug advertising. By contrast, the government in this case, on either of appellants' theories, does not directly prevent a member of Congress, or Congress as a body, from speaking its mind. No complainant alleges that his speech has been contracted or expanded over his objection. Rather, it is the speech of other individual members which indirectly interferes with their speech and it is only indirectly, by permitting the alleged distortions to occur, that the appellees in this case can cause any conceivable interference to the rights of the appellants to receive information. We recognize that changing the questions after the answers have been given can create distortions of meaning. But the first amendment concern for interference with a willing speaker is addressed to far worse problems than the ones presented here. We find appellants' theory of indirect interference with free speech an impermissible expansion of the right to receive information doctrine.

First, such a theory might change the results in the Supreme Court's right to receive information cases. In *Board of Education v. Pico,* for example, using an indirect theory, one might argue that the rights of the school board to communicate community values would have been infringed by a court order directing that library books not be removed. The case would then have presented a clash of the rights of two sets of willing speakers. Similarly, in *Virginia Citizens,* one might have argued that the rights of pharmacists who did not wish to advertise and who thereby wished to communicate an image of professionalism for their calling would have been infringed by a rule permitting advertising. Again, the case would have presented a clash of rights. This potential for free-floating philosophical speculation and dou-

ble-think dilemmas condemns appellants' indirect theory.

Second, the major concern of the Supreme Court in its right to receive information cases, that the government should not single out particular types of speech for censorship, *see, e.g., Board of Education v. Pico,* 457 U.S. at 874, 102 S.Ct. at 2811 (books removed as "anti-American, anti-Christian, anti-Sem[i]tic, and just plain filthy"); *Virginia Consumers,* 425 U.S. at 770, 96 S.Ct. at 1829 (statute prohibiting prescription drug advertising, despite its truthful character); *Lamont,* 381 U.S. at 306–07 (statute prohibiting immediate distribution of communist materials from overseas), is not present here. Every congressional speaker is equally permitted to publish his thoughts in the Record.

Third, the relief requested here is not removal of interference with communication, but essentially increased access to information. According to congressional rules, the transcripts of a member's speech are his own property. One member does not have the right to inspect or correct another's remarks. In order to ensure an accurate Record, appellants must have access to the information contained in the transcript to determine what words were actually spoken and whether the Record conforms to the congressional rules on accurate publication. Appellants must accept that the member who wishes to revise his remarks is a willing speaker. On appellants' indirect theory, there exists another willing speaker, who wishes to transmit his remarks free of any potential distortion by the remarks of the first speaker. To enforce the asserted rights of the second speaker, however, would clearly infringe on the rights of the first to withhold information. Many members and probably most taxpayers would prefer the result that brings about the shortest Record possible. In any event, the current House of Representatives has reached a provisional political solution. For us to wade into the dispute confounds common sense and the Constitution.

CONCLUSION

For 200 years, Congress has institutionally determined and redetermined the question of what kind of printed (and electronic) record should be kept of the proceedings of that body. It is most unlikely that any procedure has ever fully satisfied every member of the Congress or their constituents. This court cannot provide a second opinion on what is the best procedure. Notwithstanding the deference and esteem that is properly tendered to individual congressional actors, our deference and esteem for the institution as a whole and for the constitutional command that the institution be allowed to manage its own affairs precludes us from even attempting a diagnosis of the problem.

*Affirmed.*