Robert H. **MICHEL**, et al., Appellants,

v.

Donnald K. **ANDERSON,**
et al., Appellees.

No. 93–5109.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 22, 1993.

Decided Jan. 25, 1994.

Dennis M. Black, Washington, DC, argued the cause, for appellants. With him on the brief was David M. Aufhauser, Washington, DC.

Charles Tiefer, Acting Gen. Counsel, U.S. House of Representatives, Washington, DC, argued the cause, and filed the brief, for appellees.

Edwin E. Huddleson, III, James P. Mercurio, Wayne H. Matelski, John H. Pickering, James Robertson, Amy Farr Robertson, Roderic Von Oesen Boggs, and Myles V. Lynk were on the brief, for amici curiae, American Civil Liberties Union of the National Capital Area, et al. Arthur Barry Spitzer, Washington, DC, entered an appearance.

·Before: SILBERMAN and RANDOLPH, Circuit Judges, FRANK M. COFFIN,* Senior Circuit Judge, United States Court of Appeals for the First Circuit.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

A number of congressmen and individual voters appeal from the judgment of the district court rejecting their challenge to a House rule granting delegates from the territories and the District of Columbia the right to vote in the Committee of the Whole. We hold that the provision does not violate Article I of the Constitution and therefore affirm.

## I.

Between 1900 and 1974, Congress created the offices of five delegates to the House of Representatives, representing Puerto Rico, Guam, the Virgin Islands, American Samoa, and the District of Columbia. The rules of the House—at least between 1900 and 1970—permitted the delegates to debate, but did not allow them to vote in any setting. In 1970, those rules were changed, and the delegate from Puerto Rico was given the addi-

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1988).

tional right to vote in standing committees.[1] On January 5, 1993, the House granted all five delegates the right to vote in the Committee of the Whole, a committee composed of all members of the House through which all public bills affecting revenue and spending proceed, and which shapes, to a very great extent, the final form of bills that pass the House. The new House Rule XII, cl. 2, provides that:

> [i]n a Committee of the Whole House on the state of the Union, the Resident Commissioner to the United States from Puerto Rico and each Delegate to the House shall possess the same powers and privileges as Members of the House.

In addition, the House amended its Rule XXIII, to provide:

> [w]henever a recorded vote on any question has been decided by a margin within which the votes cast by the Delegates and the Resident Commissioner have been decisive, the Committee of the Whole shall automatically rise and the Speaker shall put that question de novo without intervening debate or other business. Upon the announcement of the vote on that question, the Committee of the Whole shall resume its sitting without intervening motion.

House Rule XXIII, cl. 2(d).

Robert H. Michel, the House Minority Leader, and 11 other members of the House, filed suit against the Clerk of the House and the territorial delegates, seeking a declaration that the House rules were unconstitutional, and an injunction preventing the delegates from attempting to vote in the Committee of the Whole and the Clerk from tallying such votes.[2] The complaint was subsequently amended to add three private voter plaintiffs: one represented by appellant Congressman Michel from Illinois, one by appellant Congressman Castle from Delaware, and one by appellant Congressman Thomas from Wyoming.

The district court denied the appellants' application for a preliminary injunction and dismissed the case. After disposing of a number of jurisdictional issues, the court determined that "for most practical purposes" the "Committee of the Whole is the House of Representatives," and that accordingly a rule that would permit delegates to vote in that committee without qualification, would "invest them with legislative power in violation of Article I of the Constitution." *Michel v. Anderson*, 817 F.Supp. 126, 141 (D.D.C.1993). The court concluded that the rules are constitutional, however, because the "revote" provision left Rule XII with "no effect, or only at most an unproven, remote, and speculative effect, as far as voting or the exercise of legislative power is concerned." 817 F.Supp. at 145. This appeal followed.[3]

## II.

■ Appellees and *amici* assert various jurisdictional defects in the case. *Amici* challenge the standing of the individual voters and also assert that the political question doctrine makes appellants' claims nonjusticiable. Ordinarily, we would not entertain an *amicus'* argument if not presented by a party, but as these questions go to our jurisdiction, we are obliged to consider them on our own and therefore welcome *amici*'s presentation. Appellees argue that under our Circuit's remedial discretion doctrine, we lack jurisdiction to provide relief to the appellants.

■ *Amici* do not question the congressmen's standing to assert that their voting power has been diluted. *Vander Jagt v. O'Neill*, 699 F.2d 1166 (D.C.Cir.1982), *cert. denied*, 464 U.S. 823, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983), establishes that congressmen asserting such a claim have suffered an Article III injury. *See* 699 F.2d at 1168–71 (holding that congressmen have standing to challenge method by which House committee

---

1. By statute and practice, the privileges of the other delegates are tied to those enjoyed by the Puerto Rican Resident Commissioner. *See infra.*

2. For the sake of convenience, we will occasionally refer to the appellees as "the House." This is not, however, intended to imply that a suit

naming the House itself as a defendant would be proper.

3. The parties here include a number of *amici curiae* in support of appellee Eleanor Holmes Norton, the delegate from the District of Columbia.

seats are allocated). *Amici* rely instead on the remedial discretion doctrine raised by appellees to blunt the congressmen's claim. But the remedial discretion doctrine, if it applies, bars the congressmen's suit, not the individual voters', *see infra,* so, understandably, *amici* attack the private voters' standing. As we understand *amici's* argument, private voters who are in districts represented by the appellant congressmen lack a distinct or palpable injury because their supposed injury—the dilution of the voting power of their congressmen—is suffered by every American voter who resides in any state. As such, the voters are raising only a generalized, abstract grievance which, as has been said repeatedly, is not an injury for Article III purposes. *See Frothingham v. Mellon,* 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923); *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 227, 94 S.Ct. 2925, 2935, 41 L.Ed.2d 706 (1974).

That an injury is widespread, however, does not mean that it cannot form the basis for a case in federal court so long as each person can be said to have suffered a distinct and concrete harm. *See Public Citizen v. United States Dep't of Justice,* 491 U.S. 440, 449–50, 109 S.Ct. 2558, 2564, 105 L.Ed.2d 377 (1989) ("The fact that other citizens or groups of citizens might make the same complaint ... does not lessen appellants' asserted injury...."). The Supreme Court has repeatedly held that voters have standing to challenge practices that are claimed to dilute their vote, such as being placed in a voting district that is significantly more populous than others. *See Wesberry v. Sanders,* 376 U.S. 1, 5–6, 84 S.Ct. 526, 529, 11 L.Ed.2d 481 (1964); *Franklin v. Massachusetts,* —— U.S. ——, ——, 112 S.Ct. 2767, 2776–77, 120 L.Ed.2d 636 (1992). To be sure, in this case the alleged dilution occurs after the voters' representative is elected, and so *amici* argue that the voters' claim is "derivative." But we do not understand why that should be of significance. It could not be argued seriously that voters would not have an injury if their congressman was not permitted to vote at all on the House floor.

That all voters in the states suffer this injury, along with the appellants, does not make it an "abstract" one. Suppose, for sake of analysis, the House were to prevent all congressmen from the State of Georgia from voting in the House. It is obvious that Georgia voters would have suffered an injury. The same would be so if every state but Georgia were given an extra vote in the House. In the case at bar, the voters *in every state* are in the same legal position as Georgia voters in the hypotheticals. The difference is one of degree rather than kind. As a practical matter, it is not surprising that only voters in the plaintiff congressmen's districts have appeared as appellants. Amongst all voters, they may have the greatest political incentive to sue.

*Amici* are correct in contending that the degree of voter dilution in this case is theoretically the same no matter in which state a voter resides. But that would be equally true if the House purported to add as members the mayors of the 100 largest cities. All voters (except the mayors) in congressional districts would have their vote diluted and thus any of those voters could claim an injury. If, as has been repeatedly held, voters have standing to raise a vote-dilution claim based on the size of their districts—*e.g.,* that their district contains 548,000 people while the neighboring district contains "only" 535,000—it is difficult to understand why voters would not have standing to raise a claim that their vote was diluted because previously they had a right to elect a representative who cast one of 435 votes, whereas now their vote elects a representative whose vote is worth only one in 440.

Amici's alternative jurisdictional argument is that the case raises a "political question" and is thus nonjusticiable. Such a question is nonjusticiable when there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it...." *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962). It is argued that Article I, § 5 of the Constitution, "Each House may determine the Rules of its Proceedings, ..." bestows on the House and only the House the authority to decide whether delegates may vote in the Commit-

tee of the Whole. *Amici* point to *Nixon v. United States,* decided last term, in which the Supreme Court held that the constitutional grant to the Senate of the "sole power to try impeachments" rendered nonjusticiable the question of whether the Senate could delegate to a committee of senators the function of gathering evidence and hearing testimony. *See* —— U.S. ——, ——, 113 S.Ct. 732, 739–40, 122 L.Ed.2d 1 (1993).

Earlier, however, the Court had held that despite the language in Article I, § 5, "Each House shall be the Judge of the ... Qualifications of its own Members ...," the House could not refuse to seat Adam Clayton Powell, Jr. because another provision, Article I, § 2, set forth the qualifications of membership and the House could not add to those qualifications. *See Powell v. McCormack,* 395 U.S. 486, 550, 89 S.Ct. 1944, 1979, 23 L.Ed.2d 491 (1969). In *Nixon, Powell* was both distinguished and reaffirmed. The Court explained:

> Our conclusion in *Powell* was based on the fixed meaning of "[q]ualifications" set forth in Art. I, § 2. The claim by the House that its power to "be the Judge of the Elections, Returns and Qualifications of its own Members" was a textual commitment of unreviewable authority was defeated by the existence of this separate provision specifying the only qualifications which may be imposed for House membership. The decision as to whether a member satisfied these qualifications *was* placed with the House, but the decision as to what these qualifications consisted of was not.
>
> In the case before us, there is no separate provision of the Constitution which could be defeated by allowing the Senate final authority to determine the meaning of the word "try" in the Impeachment Trial Clause. We agree with Nixon that courts possess power to review either legislative or executive action that transgresses identifiable textual limits. As we have made clear, "whether the action of [either the Legislative or Executive Branch] exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of

> this Court as ultimate interpreter of the Constitution." *Baker v. Carr, supra,* 369 U.S., at 211, 82 S.Ct. at 706....

*Nixon,* —— U.S. at ——, 113 S.Ct. at 740.

Appellants analogize this case to *Powell* and distinguish *Nixon,* pointing to constitutional text which limits the rulemaking grant: "The House of Representatives shall be composed of *Members* chosen every Second Year by the People of the Several States...." Art. I, § 2. As House counsel concedes, were the House to create members not "chosen every second year by the People of the several states," and bestow upon them full voting privileges, such an action, whether or not pursuant to House rules, would be blatantly unconstitutional. Therefore, the question presented in this case—whether granting delegates the power to vote in the Committee of the Whole bestows a status equivalent to membership on the delegates—cannot be thought to have been delegated by the Constitution to the House to decide. There are limitations to the House's rulemaking power, and Art. I, § 2 is such a limit.

Appellees (in effect, the House of Representatives) bypass standing and justiciability and rely instead on our line of cases which elaborated the "remedial discretion doctrine." That concept precludes this court from granting equitable relief—either declaratory or injunctive—if it interferes with the internal operation of the House or Senate. Most recently, in *Humphrey v. Baker,* 848 F.2d 211 (D.C.Cir.), *cert. denied,* 488 U.S. 966, 109 S.Ct. 491, 102 L.Ed.2d 528 (1988), a suit brought by a number of congressmen challenging the constitutionality of the Federal Salary Act of 1967 because it allegedly deprived them of their right to vote on legislation, we explained that "[u]nder the doctrine of equitable discretion, the availability of an internally available remedy to Members of Congress means that it would be an abuse of discretion for the judiciary to entertain the action." *Id.* at 214.

■ As was true in *Humphrey,* Congressman Michel and his colleagues could just as easily seek relief from their fellow House members. Appellants, therefore, would have us narrow *Humphrey*'s categorical language to conform to earlier formulations of the

doctrine that suggest that it is a rule of discretion whose primary focus is on the intrusiveness *vel non* of the remedy sought. *See, e.g., Riegle v. Federal Open Market Comm.,* 656 F.2d 873, 881 (D.C.Cir.), *cert. denied,* 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 616 (1981); *Vander Jagt v. O'Neill,* 699 F.2d 1166, 1176–77 (D.C.Cir.1982), *cert. denied,* 464 U.S. 823, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983). They claim that here we need not concern ourselves with an intrusive remedy or subsequent congressional compliance with our decision, because all that is needed is a declaration that the House rule is unconstitutional, which would restore the *status quo ante.* It appears to us, however, that it is unnecessary to struggle with the doctrine since, however construed, it has no applicability to private voters. *See Gregg v. Barrett,* 771 F.2d 539, 546 (1985).[4] Appellees suggest that to permit a private voter to bring an action challenging a House practice, which a House member could not, results in an undermining of the remedial discretion doctrine. That seems something of a bootstrap argument since the doctrine—a prudential self-imposed limitation on our remedial discretion—is premised on a congressman's ability to take care of his own interests by persuading his colleagues, and a private voter lacks that capacity. The remedial discretion doctrine, therefore, cannot be employed to bar a private citizen's claim over which we have jurisdiction.

### III.

■ Turning to the merits, we first consider whether the rule is contrary to the legislation which created the delegates. The parties agree that the office of a delegate representing a territory (or the District of Columbia) could not be created other than through legislation, which, of course, requires the concurrence of the Senate and normally the President. The offices of each of the five delegates were created by statute, *see* 48 U.S.C. § 891 (1988) (Puerto Rico); 48 U.S.C. § 1711 (1988) (Guam and the Virgin Islands); 48 U.S.C. § 1731 (1988) (American Samoa); 2 U.S.C. § 25a (1988) (District of Columbia), and the delegates are paid, and their offices staffed, out of the public treasury. *See, e.g.,* 48 U.S.C. §§ 1715, 1735 (1988). If, as appellants claim, these offices were created on the condition that the delegates would not be permitted to vote in the Committee of the Whole, then that condition would trump any authority of the House to change its rules unilaterally to grant that power. A statute, enacted into law by bicameral passage and presidential approval (or upon an override of a presidential veto), cannot be amended by one chamber unilaterally. *INS v. Chadha,* 462 U.S. 919, 952, 103 S.Ct. 2764, 2784–85, 77 L.Ed.2d 317 (1983). For this reason, appellees concede that if the statutes creating the delegate offices specifically provided that the delegates would not vote in the Committee of the Whole, the House's rule providing that vote would be invalid.

Appellants' argument that the legislation precludes the rule is not insubstantial but, at bottom, it is dependent on one remark by then-Congressman Foley during the debate over the extension to the Resident Commissioner from Puerto Rico of the right to vote in standing committees. With the exception of the statute creating the office of the delegate from the District of Columbia, the acts creating the other delegates all tie explicitly those delegates' privileges to those of the Resident Commissioner for Puerto Rico. The legislation creating the delegates from Guam and the Virgin Islands specifies that they "shall be entitled to whatever privileges and immunities are, or hereinafter may be, granted to the Resident Commissioner for Puerto Rico: *Provided,* That the right to vote in committee shall be as provided by the

---

**4.** Appellees seek to distinguish *Gregg* on the ground that the private voters there had suffered an injury separate from that suffered by the congressmen. We are unpersuaded by that distinction. *Gregg* involved a challenge to the allegedly inaccurate procedures used in compiling the Congressional Record. The congressional plaintiffs claimed an injury to their alleged First Amendment right to have their views transmitted accurately, while the voters asserted the corollary right to *receive* those views accurately. *See* 771 F.2d at 540. Here, the congressmen allege that their voting power in Congress has been diluted, whereas the voters complain of a dilution in *their* representational rights. That injury is at least as distinct from the congressmen's as the harm alleged in *Gregg.*

Rules of the House of Representatives." 48 U.S.C. § 1715 (1988). The delegate from American Samoa, in turn, is granted "whatever privileges and immunities that are, or hereinafter may be, granted to the nonvoting Delegate from the Territory of Guam." 48 U.S.C. § 1735 (1988).

Although the statute creating the Office of the Delegate from the District of Columbia in 1970 did not specifically refer to the powers of the Puerto Rican delegate and provided that the delegate shall have a seat "with the right of debate, but not of voting," *see* Pub.L. 91–405, § 202, 84 Stat. 848 (1970), codified at 2 U.S.C. § 25a (1988), it is not argued that the District's delegate was intended any less or more authority than that granted the other delegates, so it is undisputed that Congress also authorized the District delegate to vote "in committee."

The key question, then, is the scope of the powers to be exercised in the House by the Resident Commissioner from Puerto Rico. The office of Resident Commissioner was established by an Act of Congress in 1900, *see* Act of Apr. 12, 1900, ch. 191, 31 Stat. 86 (Apr. 12, 1900), but the Act is entirely silent as to the Commissioner's function and privileges. *See* 48 U.S.C. § 891 (1988). Those privileges were clarified somewhat when Congress enacted the Legislative Reorganization Act of 1970. That Act, passed by both Chambers and signed into law by the President, adopted, *inter alia*, certain rules for the two Houses. One such provision specified that the Commissioner "shall be elected to serve on standing committees in the same manner as Members of the House and shall possess in such committees the same powers and privileges as the other Members." Pub.L. No. 91–510, § 129(b), 84 Stat. 1161. Thus, the rule enacted by statute provided that the commissioner would vote in the *standing committees.* Appellants argue that under the principle of *inclusio unius est exclusio alterius* the commissioner was not authorized to vote in the Committee of the Whole. The question is more complicated, however, because of section 101 of the Act, which specifies:

> The following sections of this title are enacted by the Congress—

> (2) insofar as applicable to the House of Representatives, as an exercise of the rule-making power of the House of Representatives, subject to and *with full recognition of the power of the House of Representatives to enact or change any rule* of the House *at any time* in its exercise of its constitutional right to determine the rules of its proceedings.

Pub.L. No. 91–510, § 101, 84 Stat. 1143 (1970).

While it is fair to conclude that in 1970 Congress did not contemplate that the delegates would vote in the Committee of the Whole, section 101 of the Act, on its face, appears to delegate to the House the power to alter that situation by rule. Appellants claim that could not be so, however, because the Congress, in 1970, did not believe it would be constitutional for the House to provide, by rule, that the delegate should vote in the Committee of the Whole. They rely on legislative history. Apparently in response to a prearranged question from Congressman Sisk, who, troubled by the constitutionality of the provision granting the commissioner (and by statutory implication now, the other delegates) the vote in the standing committees, asked whether section 129 could be construed to grant such a vote in the Committee of the Whole as well, then-Congressman Foley responded:

> Now it is very clear ... that a constitutional amendment would be required to give the Resident Commissioner a vote in the Committee of the Whole or the full House.... The point is that the constitutional issue does not touch preliminary advisory votes which is what standing committees votes are, but only the votes which are cast in the Committee of the Whole or the full House. These votes can be cast only by Members of Congress.

116 CONG.REC. 31,849 (1970).

If it could be said that the whole House meant section 101 to be limited by that constitutional restriction, appellants would have a compelling argument. But we do not see how we can ascribe Congressman Foley's views to the whole House. Nothing in the legislation reflects that understanding. As we have recently noted, we have an obli-

gation to construe statutes to avoid serious constitutional questions, *see Association of Am. Physicians & Surgeons, Inc. v. Clinton,* 997 F.2d 898, 910 (D.C.Cir.1993), but we think appellants' claimed interpretation relies too heavily on the remarks of only one congressman (fated, albeit, to be the Speaker) to defeat the plain language of section 101. Moreover, since appellants' claimed construction of the statute depends on the 1970 Congress entertaining the same view of the Constitution appellants assert in this case, by relying on that proposition we would come very close to endorsing that view of the Constitution—which undermines the purpose of the rule of statutory construction. We have, therefore, no alternative but to pass on to the constitutional issue.

## IV.

The question before us is shaped by the parties' arguments and, even more, their concessions. The appellants do not challenge the constitutionality of the practice of permitting delegates to vote on standing committees, although, recognizing the difficulty in drawing a constitutional line between the Committee of the Whole and the standing committees, they do not concede the constitutionality of the prior House rule permitting delegates to vote in the latter. The appellees, for their part, forthrightly concede that the House could not permit persons other than the traditional territorial delegates to perform the role currently played by the delegates. It would, thus, not be open to the House to authorize by rule, say, the mayors of the 100 largest cities to serve and vote on House committees. Nor could the House, appellees agree, deprive any *member* of the right to vote in the Committee of the Whole (or in a standing committee). Finally, despite the House's reliance on the revote mechanism to reduce the impact of the rule permitting delegates to vote in the Committee of the Whole, appellees concede that it would be unconstitutional to permit anyone but members of the House to vote in the full House under any circumstances. In other words, delegates could not be authorized to vote in proceedings of the full House subject to a revote. So the issue is narrowed to the question: May the House authorize territorial delegates to vote in the House's committees, particularly the Committee of the Whole?

The district court, it will be recalled, thought the House rule would have violated Article I if it had not been qualified by the revote provision, because it would have "invested the delegates with legislative power." Appellants reiterate that proposition, but claim that since the qualification is not complete—some voting power is passed to the delegates notwithstanding the revote provision—Rule XII violates Article I. As *amici* point out, however, and appellants ultimately concede, Article I, § 1, grants the legislative powers to the *Congress,* which in turn consists of the Senate and House of Representatives. No one congressman or senator exercises Article I "legislative power." Therefore, it is not meaningful to claim that the delegates are improperly exercising Article I legislative authority. The crucial constitutional language implicated by appellants' claim (which appellants point out) is, instead, Article I, § 2: "The House of Representatives shall be composed of Members...." That language precludes the House from bestowing the characteristics of membership on someone other than those "chosen every second Year by the People of the several States."

But what are the aspects of membership other than the ability to contribute to a quorum of members under Article I, § 5, to vote in the full House, and to be recorded as one of the Yeas or Nays if one-fifth of the members so desire? The Constitution, it must be said, is silent on what other characteristics of membership are reserved to members. Although it seems obvious that the Framers contemplated the creation of legislative committees—the Constitutional Convention itself, *see* SUPPLEMENT TO MAX FARRAND'S THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 370–71 (James H. Hutson, ed., 1987) (index) (listing the numerous committees used by convention during drafting of Constitution), as well as the Continental Congress, *see* JENNINGS B. SANDERS, EVOLUTION OF EXECUTIVE DEPARTMENTS OF THE CONTINENTAL CONGRESS: 1774–1789, at 4, 6–8, 41–43 (1935), utilized

committees frequently—the Constitution does not mention such committees.

■ Accordingly, appellees look to the practice of the early congresses relating to territorial delegates as an interpretative aid. Although the actions of the early congresses are not a perfect indicator of the Framers' intent, those actions provide some indication of the views held by the Framers, given the propinquity of the congresses and the framing and the presence of a number of Framers in those congresses. *Cf. Marsh v. Chambers,* 463 U.S. 783, 788–791, 103 S.Ct. 3330, 3334–3336, 77 L.Ed.2d 1019 (1983). The first territorial delegate, representing the Northwest Territories, was created by statute during the first Congress. *See* 1 Stat. 50, 52 (1789). William Henry Harrison, who occupied that office, was granted considerable privileges in Congress, including the power of making motions, *see* 6 ANNALS OF CONGRESS 197–98 (1799), and of serving as chairman of a committee. *See* 6 ANNALS OF CONGRESS 527 (1800). "Harrison's Committee on Public Lands not only procured the passage of the Land Act of 1800, but also served as a clearing house for all petitions and special measures relating to lands in the Northwest." DOROTHY BURNE GOEBEL, WILLIAM HENRY HARRISON: A POLITICAL BIOGRAPHY 46 (1974).

The practice of permitting delegates to serve on and to chair standing committees continued into the nineteenth century. *See* II ASHER C. HINDS, HINDS' PRECEDENTS OF THE HOUSE OF REPRESENTATIVES § 1299, at 865 (1907). Those delegates may even have been granted the right to vote in the standing committees. According to a report on the qualifications of David Levy to serve as Delegate from Florida, prepared by the House Committee on Elections in 1841,

> [w]ith the single exception of voting, the Delegate enjoys every other privilege and exercises every other right of a Representative. He can act as a member of a standing or special committee and vote on the business before said committees, and

he may thus exercise an important influence on those initiatory proceedings by which business is prepared for the action of the House.

H.R.REP. No. 10, 27th Cong., 1st Sess., at 5 (1841). This report, although indicative of the House's practice around 1840, admittedly provides no direct documentary proof that delegates were permitted to vote in the standing committees in the first congresses as well. Be that as it may, the territorial delegates were certainly accorded a unique status by the first congresses. At the earliest times, Congress viewed the territorial delegates as occupying a unique middle position between that of a full representative and that of a private citizen who presumably could not serve on or chair House committees.

The territorial delegates, representing those persons in geographical areas not admitted as states, then, always have been perceived as would-be congressmen who could be authorized to take part in the internal affairs of the House without being thought to encroach on the privileges of membership.

Appellants, not disputing the main line of appellees' historical presentation, but without conceding the legitimacy of the practice, assert that the rule in question is a qualitatively different matter. Whatever the legitimacy of permitting delegates' participation—even full participation—in the work of standing committees, the Committee of the Whole is so close to the full House that permitting the delegates to vote there is functionally equivalent to granting them membership in the House.

Appellants claim, for instance, that provisions removed by the committee cannot be resurrected on the floor of the House, and that by longstanding practice, enforced by rules of procedure attached to successive bills, the House cannot amend bills that reach the floor but rather must vote up or down on the bills *in toto.*[5] As appellees point

---

5. Appellants concede that members may introduce in the full House a motion to recommit a bill to the standing committees for amendment, but understandably argue that the existence of this time-consuming and cumbersome procedure

does little in practice to cure the influence of the Committee of the Whole's proceedings on final bills. Alternatively, appellant congressmen argue that they should not be compelled to surmount such difficult hurdles in order to enforce

out, appellants' description of the power of the committee is somewhat exaggerated, but, in any event, appellants' argument, even if true, proves too much. Any number of procedures sharply limit the range of options among which the House can choose when bills reach the floor. The House rules could give any standing committee, as it does conference committees, the authority to put bills to the House floor without the possibility of amendment. Indeed, under the "fast track" legislation, *see* 19 U.S.C. § 2903 (1988 & Supp.1991), a procedural device passed by each House as an exercise of rulemaking power, the President may submit various treaties to the two Houses for ratification on a take-it-or-leave-it basis. That device surely does not make the President the functional equivalent of the full House. In any event, whatever authority the Committee of the Whole exercises, it does so only at the sufferance of the full House which can alter the Committee of the Whole's function at any time.

Nevertheless, it would blink reality to deny the close operational connection between the Committee of the Whole and the full House. The House itself recognized how perilously close the rule change came to granting delegates a vote in the House. That is why the House sought to ameliorate the impact of the change through the revote provision. That has led the parties to dis-

pute vigorously the degree to which, notwithstanding the revote provision, the granting of a vote to the delegates in the Committee causes a change in the dynamics of the behavior of the House. Appellees are put in the awkward position of claiming that the revote provision causes the grant of voting authority to the delegates to be only symbolic. It is not necessary to explore and analyze all the scenarios about which the parties conjecture.[6] Suffice it to say that we think that insofar as the rule change bestowed additional authority on the delegates, that additional authority is largely symbolic and is not significantly greater than that which they enjoyed serving and voting on the standing committees. Since we do not believe that the ancient practice of delegates serving on standing committees of the House can be successfully challenged as bestowing "membership" on the delegates, we do not think this minor addition to the office of delegates has constitutional significance.

\*   \*   \*   \*   \*   \*

Accordingly, the district court's judgment is affirmed.

*So ordered.*

---

their right not to have their vote diluted by the delegates' participation.

**6.** Under one such scenario advanced by appellants, the five delegates would each agree to trade their votes on a certain bill with three members in exchange for the members' support of the delegates' pet bill. That pet bill, then, might pass by a margin of 15 votes—too great a number to trigger the revote mechanism but nevertheless a margin that might not have existed were it not for the ability of the delegates to trade their newly granted votes in the Committee. The implicit underlying assumption is that a member would be willing to trade his vote for a delegate's at par, even though in a close vote (presumably the only vote where such a trade would matter) the delegate's own vote could not have a decisive effect because of the revote mechanism. Of course, the membership of delegates on standing committees already endowed them with considerable vote-trading possibilities.

Appellants raise as a second scenario the possibility that by casting a decisive vote, a delegate

could "force" a revote, and that the "power" to force a second vote might itself be sufficient to alter the result. Appellants point to a number of instances (unrelated to delegate voting) in which two successive votes were taken on a bill, with the result of the second differing from that of the first. *See* 139 Cong.Rec. 4,184 (daily ed. June 29, 1993); 139 Cong.Rec. 4,788 (daily ed. July 20, 1993). The power to force a second vote is not, however, all that different from the power to resubmit a bill for consideration by the House, a power that the delegates historically have enjoyed.

Finally, appellants point out that House Rule XXIII only provides for a revote on *recorded* votes, and that the delegates might cast decisive votes when such votes are unrecorded. While this is theoretically true, it is unclear how often, if ever, an unrecorded vote on a controversial matter would be decisive, given that it takes only 25 members to force a recorded vote. *See* House Rule XXIII, cl. 2(b).