# IN THE SUPREME COURT OF THE STATE OF DELAWARE

THE HONORABLE ANTHONY J.
ALBENCE, in his official capacity as
State Election Commissioner, and
STATE OF DELAWARE
DEPARTMENT OF ELECTIONS,

Defendants Below,
Appellants,

v.

MICHAEL MENNELLA and THE
HONORABLE GERALD W.
HOCKER,

Plaintiffs Below,
Appellees.

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

No. 120, 2024

Court Below: Superior Court
of the State of Delaware

C.A. No. S23C-03-014

Submitted: June 5, 2024
Decided: June 28, 2024

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LeGROW**, and **GRIFFITHS**, Justices constituting the Court *en banc*.

Upon appeal from the Superior Court. **REVERSED**.

Kathleen Jennings, Esquire, Attorney General of the State of Delaware, Alexander S. Mackler, Esquire, Patricia A. Davis, Esquire, Kenneth Wan, Esquire, DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware; Donald B. Verrilli, Jr., Esquire, (*argued*), Ginger D. Anders, Esquire, MUNGER, TOLLES & OLSON LLP, Washington, DC, *for Appellants the Honorable Anthony J. Albence and the State of Delaware Department of Elections*.

M. Jane Brady, Esquire, (*argued*), BRADY LEGAL GROUP LLC, Lewes, Delaware, *for Appellees Michael Mennella and the Honorable Gerald W. Hocker*.

Noel H. Johnson, Esquire, PUBLIC INTEREST LEGAL FOUNDATION, Alexandria, Virginia, *for Appellee Michael Mennella*.

Nicole M. Mozee, Esquire, Wilmington, Delaware; Andrea Joy Campbell, Esquire, Attorney General of the Commonwealth of Massachusetts, M. Patrick Moore, Jr., Esquire, David C. Kravitz, Esquire, Adam M. Cambier, Esquire, Vanessa A. Arslanian, Esquire, Erin E. Fowler, Esquire,  Boston, Massachusetts, *for Amici Curiae Massachusetts, Arizona, California, The District of Columbia, Hawaii, Illinois, Minnesota, Nevada, New Jersey, New York, Oregon, Pennsylvania, Vermont, and Washington, in support of Appellants.*

David C. McBride, Esquire, YOUNG CONAWAY STARGATT & TAYLOR LLP, Wilmington, Delaware; Richard H. Morse, Esquire, COMMUNITY LEGAL AID SOCIETY, INC., Wilmington, Delaware, *for Amici Curiae Community Legal Aid Society, Inc. and The ARC of Delaware, in support of Appellants.*

Dwayne Bensing, Esquire, Andrew Bernstein, Esquire, ACLU FOUNDATION OF DELAWARE, Wilmington, Delaware, *for Amici Curiae American Civil Liberties Union Foundation of Delaware and The League of Women Voters of Delaware in support of Appellants.*

**TRAYNOR**, Justice:

The plaintiffs—a citizen who hopes to serve as an inspector of elections during this year's election and a Delaware State Senator who will not be on the ballot in that election—have challenged, and the Superior Court has struck down, a pair of statutes affecting this State's voting procedures. One of the statutes, which allows absentee voters to request "permanent absentee" status, has been on the books for nearly 15 years; the other, which is of a more recent vintage, authorizes qualified, duly registered voters to vote in person during at least 10 days before an election. According to the plaintiffs, the statutes clash with the provisions of the Delaware Constitution that govern elections and voting.

In the Superior Court and again in this Court, the State Election Commissioner and the State of Delaware Department of Elections have challenged the plaintiffs' standing to assert their constitutional claims. Standing—a concept that "is concerned only with the question of *who* is entitled to mount a legal challenge and not with the merits of the subject matter of the controversy"[1]—is a threshold question in cases such as this. To achieve standing, a plaintiff must allege an injury in fact that is both concrete and actual or imminent. The injury must also be more than a generalized grievance—it must be particularized, that is, "the plaintiff's interest in the controversy must be distinguishable from the interest shared by other members

---

[1] *Stuart Kingston, Inc. v. Robinson*, 596 A.2d 1378, 1382 (Del. 1991).

of a class or the public in general."[2] As the United States Supreme Court has observed, requiring imminent, particularized harm for standing ensures litigants have "a direct stake in the controversy and prevents the judicial process from becoming no more than a vehicle for the vindication of the value interests of the concerned bystanders."[3]

Because we conclude that the plaintiffs have not met their burden of establishing imminent or particularized harm—crucial standing elements—our answer to the question is dispositive. For the reasons that follow, we have concluded that neither of the plaintiffs has standing and therefore reverse the judgment of the Superior Court.

## I

Because we have concluded that the plaintiffs do not have standing, we do not reach the merits of their state constitutional claims. All the same, we begin with a brief overview of the statutes in question and the procedural history of the plaintiffs' challenge.

## A

Title 15, Chapter 55 of the Delaware Code addresses "Absentee Voting." The provision challenged by the plaintiffs here, 15 *Del. C.* § 5503(k), the "Permanent-

---

[2] *Id.*
[3] *United States v. Students Challenging Regul. Agency Procs. (SCRAP)*, 412 U.S. 669, 687 (1973).

4

Absentee Statute," was added to Chapter 55 through a 2010 amendment, and was amended again in 2012.[4]

An elector who desires to vote by absentee ballot for one of the reasons set forth in § 5502(1)–(8) may request an absentee ballot by no later than noon the day before the election.[5]  Section 5503(k) further permits eligible absentee voters— specifically those qualified under § 5502 (1),(2),(4),(7), or (8)—to apply for "permanent absentee" status.[6]  Once a voter is granted permanent-absentee status, the Department "shall automatically send an absentee ballot . . . for each election in which the person is entitled to vote."[7]

The State Election Commissioner must promulgate instructions for voters to follow in applying for permanent-absentee status[8] and "shall cancel" a person's

---

[4] *See* 77 Del. Laws, ch. 269 (2010); 78 Del. Laws. ch. 297 (2012).  The 2010 passed amendment passed the Delaware State Senate unanimously (20 yes, 0 no, 1 absent) and the House of Representatives by a vote of 34 in favor, no one against, and 4 absent.  Del. S.B. No. 225 (Apr. 1, 2010), *available at* https://legis.delaware.gov/BillDetail?LegislationId=19927.

[5] 15 *Del. C.* § 5503(a).

[6] 15 *Del. C.* § 5503(k).  A voter may be granted permanent-absentee status because:  "such person is in the public service of the United States or of this State, or is a citizen of the United States temporarily residing outside the territorial limits of the United States and the District of Columbia, or such person's spouse or dependents when residing with or accompanying the person, or is absent from this State because of illness or injury received while serving in the armed forces of the United States [15 *Del. C.* § 5502(1)]; is in the armed forces of the United States or the merchant marine of the United States, or attached to and serving with the armed forces of the United States in the American Red Cross or United Service Organizations [15 *Del. C.* § 5502(2)]; such person is sick or physically disabled [15 *Del. C.* § 5502(4)]; such person is otherwise authorized pursuant to the federal Uniformed and Overseas Citizens Absentee Voting Act . . . to vote by absentee ballot [15 *Del. C.* § 5502(7)]; or such person is otherwise authorized by federal law to vote by absentee ballot [15 *Del. C.* § 5502(8)]."

[7] 15 *Del. C.* § 5503(k).

[8] *See* 15 *Del. C.* § 5503(k)(1).  Those instructions are available on the Department of Elections Website, *available at* https://elections.delaware.gov/voter/absentee/.

permanent-absentee status upon: the return of an absentee ballot or other correspondence as undeliverable; the person's death or disqualification; the cancellation of voter registration; the receipt of a written request; or receipt of other written notification that the person's stated reason for voting by absentee ballot is no longer valid.[9] The Department must maintain a list of eligible permanent-absentee voters on its website,[10] and those voters granted permanent-absentee status must keep the Department informed as to changes in their name, address, or reason for voting by absentee ballot.[11]

According to the plaintiffs' amended complaint, the Department sent a letter to all permanent-absentee voters in January 2022, explaining that such voters "are . . . responsible, for keeping the Department informed of any changes in your residential address, mailing address (if you have one) or political party affiliation."[12] The letter also instructed the voters to contact the Department if they "no longer qualify to be or wish to remain a Permanent Absentee voter."[13]

The plaintiffs also alleged that, as of February 11, 2022, there were approximately 23,000 registrants on the permanent-absentee voter list; fourteen

---

[9] 15 *Del. C.* § 5503(k)(1), (3).
[10] 15 *Del. C.* § 5503(k)(5). State of Delaware, Department of Elections, Permanent-Absentee Voter, *available* *at* https://elections.delaware.gov/voter/absentee/pdfs/statewide_abs_permanent.pdf.
[11] 15 *Del. C.* § 5503(k)(4).
[12] App. to Opening Br. at A16–17.
[13] *Id.* at A74.

months later, the list showed that there were over 20,250 registrants on the list.[14]

This represents 3.05% and 2.63%, respectively, of all Delaware registered voters.[15]

B

Delaware's "Early-Voting Laws," (together with the Permanent-Absentee Statute, the "Challenged Statutes"), 15 *Del. C.* §§ 5401–5408, were introduced and signed into law in 2019, becoming effective, by design, on January 1, 2022.[16] The statutes require the Commissioner to designate locations for primary, general, and special elections,[17] at which qualified, registered voters may vote in person during at least ten days before an election.[18] Early voting locations must be published at least thirty days in advance of an election and meet the requirements of 15 *Del. C.* § 4512, which deals with the designation and preparation of polling places.[19] The Commissioner is to determine whether early voting will be by machine or paper ballot,[20] and the Department of Elections is to establish the procedures for daily

---

[14] *Id.* at A17–18.

[15] In February 2022, there were 754,235 registered voters. See State of Delaware Department of Election, *Voter Registration Totals: Registered Voter Totals by Month for 2022*, https://elections.delaware.gov/voter/registrationtotals/pdfs/vrt_PP20220201.pdf. In April 2023, there were 769,188 registered voters. *See* State of Delaware Department of Election, *Voter Registration Totals: Registered Voter Totals by Month for 2023*, https://elections.delaware.gov/voter/registrationtotals/pdfs/vrt_PP20230401.pdf.

[16] The Bill passed in the Delaware House of Representatives by a vote of 34 in favor, 6 opposed, and 1 absent and in the Delaware Senate with 16 in favor, 5 opposed, and none absent. Del. H.B. No. 38 (Jan. 16, 2019), *available at* https://legis.delaware.gov/BillDetail?LegislationId=37089.

[17] 15 *Del. C.* § 5401.

[18] 15 *Del. C.* § 5402.

[19] 15 *Del. C.* § 5403(a)–(b).

[20] 15 *Del. C.* § 5406.

updates of polling records to ensure the integrity of each election.[21]  Ballots cast by

early voters must be tabulated at the same time as votes cast by absentee ballots.[22]

## C

In February 2022, Michael Mennella filed suit in the Court of Chancery,

seeking injunctive and declaratory relief against the Department.[23]  Mennella alleged

that he would be harmed by the enforcement of the Challenged Statutes because he

planned to serve, as he had done in previous election cycles, as an inspector of

elections at the 2022 general election and other future elections.  According to

Mennella, his duties as an inspector of elections under the Delaware Constitution

were irreconcilable with the Challenged Statutes.

Mennella asserted that the Early-Voting Laws violate Article V, § 1 of the

Delaware Constitution, which sets forth the "[t]ime and manner of holding [the]

general election," because the laws "expand the administration of the general

election beyond its constitutionally designated day."[24]  In Mennella's view, in-

person voting is constitutionally permissible on *only* one specific date:  "the Tuesday

---

[21] 15 *Del. C.* § 5408.

[22] 15 *Del. C.* § 5407; *see also* 15 *Del. C.* § 5510(a)–(g).

[23] From this point forward, we refer to the Department and Commissioner Albence collectively as "the Department."

[24] Verified Compl. for Declaratory J. and Injunctive Relief ¶ 47, *Mennella v. Albence*, Docket No. 1, C.A. No. 2022-0179 (Del. Ch. Feb. 24, 2022) ("Court of Chancery Compl."); *see also* Opening Br. at 3.

8

next after the first Monday in the month of November."[25]  Mennella argued that, by permitting voters to cast ballots early, the Early-Voting Laws "allow the election to occur *on* ten separate days."[26]  As to the Permanent-Absentee Statute, Mennella averred that the statute violates Article V, § 4A of the Delaware Constitution, which establishes "General laws for absentee voting," because the statute "grant[s] eligibility to vote by absentee ballot indefinitely, and without consideration of the applicant's eligibility at each subsequent election[.]"[27]  Mennella asked the Court of Chancery to declare that the Challenged Statutes violate the constitutional provisions mentioned above and to enjoin the Department from enforcing them.

The Department moved to dismiss Mennella's complaint in the Court of Chancery in May 2022 based, in part, on a lack of subject-matter jurisdiction.  The State also took the position that both the Early-Voting Laws and the Permanent-Absentee Statute fell within the General Assembly's legislative power to prescribe the means and methods of voting and to implement constitutionally sanctioned absentee voting.  The parties fully briefed the motion to dismiss; however, "no argument ensued" and "consideration was suspended during pendency of another election-law challenge"[28]—a suit that Mennella joined in as a plaintiff, which

---

[25] Pl. Michael Mennella's Br. in Opp'n to Defs.' Mot. to Dismiss, *Mennella v. Albence*, Docket No. 13, C.A. No. 2022-0179, at 21–22 (Del. Ch. July 15, 2022) ("Mennella MTD Reply"); *see also* Opening Br. at 28–29 (citing Del. Const. art. V, § 1).

[26] Mennella MTD Reply at 22 (emphasis in original); *see also* Opening Br. at 28.

[27] Court of Chancery Compl. ¶ 58; *see also* Opening Br. at 41.

[28] *Mennella v. Albence*, 2023 WL 309042, at *1 (Del. Ch. Jan. 19, 2023).

challenged a different set of voting statutes—a vote-by-mail statute and a same-day registration statute. We ultimately resolved that challenge in *Albence v. Higgin*.[29]

In early 2023, after this Court announced its decision in *Higgin*, the Court of Chancery dismissed the complaint on jurisdictional grounds, and after we refused an interlocutory appeal, Mennella elected to pursue his claims, as permitted by statute,[30] in the Superior Court. Mennella amended the complaint in June 2023, adding Delaware State Senator Gerald W. Hocker as a plaintiff along with an allegation that the plaintiffs were "harmed as Delaware voters because their votes would be diluted by illegally cast ballots."[31] It is undisputed that Senator Hocker, who was re-elected to the Senate in 2022, will not be standing for election in 2024; he has alleged, however, that "[h]e intends to run again for the Delaware State Senate in future elections."[32] Like the complaint filed in the Court of Chancery, the amended complaint sought declarations that the Challenged Statutes violated the Delaware Constitution. More specifically, the plaintiffs asked the Superior Court to declare that the Permanent-Absentee Statutes violate Article V, § 4A and the Early-Voting Laws violate Article V, § 1 of our Constitution.

---

[29] 295 A.3d 1065 (Del. 2022).
[30] 10 *Del. C.* § 1902. The Department does not appeal the Superior Court's ruling rejecting its argument that this transfer was improperly executed. *Mennella v. Albence*, 2024 WL 758606, at *2–3 (Del. Super. Ct. Feb. 23, 2024) (the "Opinion").
[31] Amended Complaint Ex. A ¶¶ 63, 73, *Mennella v. Albence*, Docket No. 19, C.A. No. S23C-03-014 (Del. Super. Ct. June 16, 2023).
[32] App. to Opening Br. at A22.

10

The Department moved to dismiss the complaint under Superior Court Rules of Civil Procedure 12(b)(1) and 12(b)(6), arguing, in part, that the plaintiffs lacked standing.[33]

The Superior Court, relying on *Higgin's* statement that an active candidate who risks defeat in an election due to ballots cast under an extra-constitutional statute, determined that Senator Hocker had standing. In the court's view, Senator Hocker, "an incumbent State Senator who expressed his intention to seek reelection in a lawsuit, a matter of public record, is in fact a candidate[.]"[34] Because Senator Hocker had standing, the court concluded that a review of Mennella's standing—as an inspector of elections or as a voter—was unnecessary. Moving on to the merits, the court concluded that the plaintiffs had satisfied their burden of proof by clear and convincing evidence that the Challenged Statutes were "inconsistent with our Constitution and therefore cannot stand."[35] The Superior Court accordingly denied the defendants' motion to dismiss and granted the plaintiffs' request for declaratory judgment. This appeal followed.

D

The Department raises three arguments on appeal. First, the Department disputes that Senator Hocker and Mennella have standing in any capacity—either in

---

[33] *Id*. at A49, A51.
[34] Opinion at *2.
[35] *Id.* at *9.

their official roles or as individual voters. For its second and third arguments, the Department defends the constitutionality of the Early-Voting Laws and the Permanent-Absentee Statute.

As explained below, we disagree with the Superior Court's conclusion that Senator Hocker established standing as "a candidate." We also find that plaintiffs' arguments on standing not addressed by the Superior Court—based on Mennella's purported position as an inspector of elections and each plaintiff's position as a voter—do not establish that either has standing. And this lack of standing dictates that we should not address the plaintiffs' substantive constitutional arguments.

## II

We review questions of standing *de novo*.[36]

## III

Standing "refers to the right of a party to invoke the jurisdiction of a court to enforce a claim or to redress a grievance."[37] Standing is assessed when the complaint is filed.[38] "The party invoking the jurisdiction of a court bears the burden of establishing the elements of standing."[39] Generally, to establish standing plaintiffs must: (i) "allege an injury in fact, which is both concrete and actual or imminent"

---

[36] *See Emps. Ins. Co. of Wausau v. First State Orthopaedics, P.A.*, 312 A.3d 597, 606 (Del. 2024).
[37] *Dover Hist. Soc'y v. City of Dover Plan. Comm'n*, 838 A.2d 1103, 1110 (Del. 2003).
[38] *Emps. Ins. Co.*, 312 A.3d at 607.
[39] *Dover Hist. Soc'y*, 838 A.2d at 1109.

such that "[a]n actual or imminent injury is one that is neither hypothetical nor conjectural"; (ii) "show that the injury is caused by the defendant's actions[,]" meaning that "the injury is 'fairly traceable' to the defendant's 'complained-of conduct'"; (iii) "show that their requested relief is likely to redress the injury";[40] and (iv) show "that the interest they seek to vindicate is 'arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'"[41] We have noted that "'a generalized grievance shared by the population at large cannot be a basis for standing.'"[42]

When a party moves to dismiss based on a lack of standing and "is not arguing that the court lacks the authority to grant the relief requested to any plaintiff (i.e., lacks subject matter jurisdiction), but rather . . . that the court cannot grant relief to *these particular plaintiffs*, the motion is more properly decided under Rule 12(b)(6)" rather than 12(b)(1).[43] This distinction matters because, under Rule 12(b)(6), we accept as true all well pleaded factual allegations, even if vague, so long as they give the defendants notice of the claim.[44] And we "draw all reasonable inferences in

---

[40] *Emps. Ins. Co.*, 312 A.3d at 608 (citations omitted).

[41] *Higgin*, 295 A.3d at 1086 (citing *Gannett Co., Inc. v. State*, 565 A.2d, 895, 897 (Del. 1989)).

[42] *Dover Hist. Soc'y*, 838 A.2d at 1113 (citing *Duke Power v. Carolina Env't Study Grp.*, 438 U.S. 59, 80 (1978)).

[43] *See Appriva S'holder Litig. Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1285–86 (Del. 2007) (emphasis added). The Department does not state the governing rule, but we discern that the Department contends that "the court cannot grant relief to *these particular plaintiffs*," not that the court lacks jurisdiction. *See* Opening Br. at 16–20. So, Rule 12(b)(6) applies.

[44] *In re GGP, Inc. S'holder Litig.*, 282 A.3d 37, 54 (Del. 2022) (discussing the Rule 12(b)(6) standard); *see also Appriva*, 937 A.2d at 1284 n.14 (explaining that "'[u]nlike the standards

favor of the non-moving party[.]"[45]  With Rule 12(b)(6) "in mind [as] the target the plaintiffs must hit to defeat"[46] the Department's justiciability challenge, we consider first Senator Hocker's standing.

## A

The Department claims that Senator Hocker did not establish the elements of standing as a purported candidate because he cannot point to an actual or imminent injury in fact.  According to the Department, Senator Hocker is neither a candidate for the 2024 election—he was re-elected in 2022 to a term set to expire in 2026— nor is he actively campaigning.  For support, the Department points to a footnote in *Higgin*, which describes Higgin's standing as "dependent upon Higgin's status as an active candidate in the affected election[.]"[47]

The plaintiffs counter that *Higgin* did not "articulat[e] exacting standards for candidate-standing in all cases[.]"[48]  They point to Senator Hocker's twenty plus years of service in office, including campaigning efforts, as demonstrating his

---

employed in Rule 12(b)(6) analysis, the guidelines for the Court's review of [a] 12(b)(1) motion are far more demanding of the non-movant.  The burden is on the [p]laintiffs to prove jurisdiction exists.  Further, the Court need not accept [p]laintiffs factual allegations as true and is free to consider facts not alleged in the complaint.'") (internal citation omitted).

[45] *GGP*, 282 A.3d at 54.

[46] *See City of Birmingham Ret. and Relief Sys. v. Good*, 177 A.3d 47, 60 (Del. 2017).  Although the "target" there was Court of Chancery Rule 23.1, the concept is the same here.

[47] Opening Br. at 17 (citing *Higgin*, 295 A.3d at 1088 n.157).

[48] Answering Br. at 16.

intention to run in future elections. They argue, in any event, that the court's finding that Senator Hocker was "in fact a candidate" was not "clearly erroneous[.]"[49]

As we address Senator Hocker's standing as a candidate and, more particularly, whether he has alleged that the Challenged Statutes have caused or will cause him to suffer an injury in fact that is "both concrete and actual or imminent," we note preliminarily that he does not claim actual injury, only that he "faces . . . the 'risk of defeat' and [an] 'inaccurate vote tally'" in future elections.[50] The first of those future elections is not the upcoming 2024 election; having been re-elected in 2022, Senator Hocker will not stand for re-election until 2026. That election, in our view, is not imminent.

Senator Hocker's stated intention to run in 2026 stands in stark contrast to the active candidacy that established the candidate's standing in *Higgin*. In that case, which was resolved on cross-motions for summary judgment, the candidate—Michael Higgin—filed an affidavit three months before the impending election confirming that he was a "filed candidate" for State Representative and was "actively campaigning" for that office, which included fundraising, meeting with voters, and distributing written materials to voters on a daily basis.[51] As evidenced by our analysis, our determination was swayed by the imminence of the looming election.

---

[49] *Id.* at 15.
[50] *Id.* at 4 (citing *Higgin*, 295 A.3d at 1087).
[51] App. to Opening Br. at A146–47.

Specifically, we observed that counting legally invalid ballots that could lead to an inaccurate vote tally could inflict "a concrete and particularized injury to candidates *participating in the affected election*."[52]  And as the Department aptly notes, we explicitly noted that our conclusion that Higgin had standing was "dependent on Higgin's status as an *active candidate in the affected election*[.]"[53]

Senator Hocker's contention that he faces imminent injury should the validity of the Challenged Statutes not be adjudicated falls short of the mark.  Keep in mind that Senator Hocker signed onto the amended complaint more than three years before the next election in which he will be a candidate.[54]  To borrow the United States Supreme Court's language in *Lujan v. Defenders of Wildlife*, this stretches "'imminence,'" an admittedly "'elastic concept, . . . beyond the breaking point[.]'"[55]  Accordingly, we conclude that Senator Hocker has not met his burden of establishing his standing as an active candidate.

B

According to the amended complaint, Mennella has served as an inspector of elections in the past and plans to serve as an inspector in the 2024 general election

---

[52] *Higgin*, 295 A.3d at 1087.
[53] *Id.* at 1088 n.157.
[54] Standing is assessed as of the filing of the complaint.  *Emps. Ins. Co.*, 312 A.3d at 607.  The complaint was amended to add Senator Hocker as a plaintiff in June 2023.
[55] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 n.2 (1992) (citation omitted).

and at other future elections. This, Mennella claims, establishes his standing to contest the constitutionality of the Challenged Statutes.

In the Department's view, these plans are hypothetical. The Department further contends that Mennella does not tie "his responsibilities as an election inspector to administering" the Challenged Statutes.[56] This is so, according to the Department, because early-voting locations are only a small fraction of the total number of polling locations, and absentee voters—by definition—do not appear at polling locations. The Department also asserts that an inspector, who serves in a limited, volunteer role, cannot turn away eligible voters simply because the inspector might believe that early voting is unconstitutional.

The plaintiffs respond that, because early-voting locations will be administered in the same way as election-day locations, Mennella will "[n]ecessarily" serve at early voting sites.[57] They also claim that voters "who are qualified to vote absentee, including permanent absentee, may return their voted ballots to the polling places on Election Day."[58] Leaning into the pleading standard, the plaintiffs thus contend—with more than a hint of hyperbole—that Mennella will be forced to choose between accepting these votes and disregarding them as illegitimate, the specter of fines and prison hanging in the balance.

---

[56] Opening Br. at 19.
[57] Answering Br. at 21.
[58] *Id.* at 23.

We are not persuaded by Mennella's argument. First, the plaintiffs do not credibly explain why an absentee ballot "may" be submitted at a polling location, when the law states instead that the "elector shall return the sealed ballot envelope to the *Department*" by either mail or delivery.[59] Second, even though it is reasonably conceivable that Mennella will serve as an inspector in 2024, including at an early-voting location, these facts are insufficient to establish standing.

We reject what we understand to be the linchpin of Mennella's argument that he has standing as an inspector of elections—that is, that he would have sweeping authority to turn away lawful voters on the ground that he personally believes that the Challenged Statutes are invalid. An inspector's role is much narrower than that.[60] An inspector may be called upon, under Delaware law, to make determinations regarding only a voter's identity, residency, and potential participation in bribery.[61] Moreover, Mennella's position raises the specter of a contrived injury—one invited by his undertaking of a voluntary role—based on his apparently political disagreement with the General Assembly.[62] This is not the type of injury that is "both concrete and actual or imminent."[63] Mennella therefore has not established standing as an inspector of elections.

---

[59] 15 *Del. C.* § 5507(4) (emphasis added).
[60] *See, e.g.*, 15 *Del. C.* §§ 4904, 4937(c), 7557(d)(5).
[61] 15 *Del. C.* §§ 4937(c), 4939, 4940, 4941, 7557(d)(5).
[62] *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).
[63] *Emps. Ins. Co.*, 312 A.2d at 608.

We turn next to the plaintiffs' claim that they have standing to assert their constitutional claims by virtue of their status as registered voters.

C

The plaintiffs' attempt to identify a concrete harm that they will suffer as voters should the Challenged Statutes stand—and thus their standing as registered voters—is confined to a single sentence (stated twice) in the amended complaint: "Plaintiffs are also harmed as Delaware voters because their votes would be diluted by illegally cast ballots."[64]

The Department argues that the plaintiffs' injury is not "'particularized[,]'" and that the plaintiffs "have alleged no . . . individualized harm that is distinguishable from the interest of scores of other Delaware voters."[65] In the Department's view, "courts have found standing based on vote dilution only where the plaintiff-voters suffer injury as individuals[.]"[66] We agree. Recognizing this alleged harm as sufficient would confer standing on every voter who chooses to vote in person on election day or by initial absentee ballot. Such an expansion of voter standing is inconsistent with the cases that recognize voter standing in limited circumstances. Moreover, to the extent the plaintiffs' vote-dilution claim finds support in the principal authority they cite—the Court of Chancery's 2022 opinion in *Higgin*—that

---

[64] App. to Opening Br. at A24, A26.
[65] Opening Br. at 20 (quoting *Dover Hist. Soc'y*, 838 A.2d at 1105, 1110).
[66] *Id.* (citing *Gill v. Whitford*, 585 U.S. 48, 60 (2018)).

19

support is weak and untethered to any meaningful analysis of how the plaintiffs' votes are diluted in a particularized way.

i

Our review of the plaintiffs' vote-dilution claim is constrained by their minimalist description of how the Challenged Statutes dilute their vote. They do not allege that their votes would count less than the votes of other electors. Neither do they allege that the electors who choose early voting or request permanent-absentee status under the Challenged Statutes would not, in the absence of those statutes, vote in person on election day. Nor do the plaintiffs explain how voting under the Challenged Statutes compromises the political efficacy of their votes. The plaintiffs allege—only in a conclusory fashion, and then only as it relates to Hocker's purported standing as a candidate for election—that early voting or voting by an elector with "permanent absentee" status will lead to an unfair election if voting under the Challenged Statutes is allowed. These pleading deficiencies, standing alone, would be sufficient to warrant dismissal of the plaintiffs' complaint for lack of standing. But the plaintiffs' claim to standing as registered voters is deficient for other reasons as well.

20

Vote dilution has been defined as "reducing the effectiveness of certain people's votes without actually preventing them from casting ballots."[67] Historically, the theory has been employed in malapportionment, racial vote dilution, and partisan gerrymandering cases. For example, in *Baker v. Carr*, the classic "'one person, one vote'" case,[68] the United States Supreme Court found that voters alleged sufficient facts to establish standing.[69] They claimed that an apportionment statute resulted in "a gross disproportion of representation to voting population . . . [that] disfavors the voters in the counties in which they reside, placing them in a position of constitutionally unjustifiable inequality vis-à-vis voters in irrationally favored counties."[70] In other words, the "wrong that plaintiffs sought to vindicate in *Baker* . . . was the dilution of their vote *relative to the vote of other citizens of the same state*—a direct, cognizable injury."[71]

In the context of the Voting Rights Act,[72] voting dilution "refers to the impermissible discriminatory effect that a multimember or other districting plan has

---

[67] Nicholas O. Stephanopoulos, *The New Vote Dilution*, 96 N.Y.U. L. Rev. 1179 (2021) (citing Daniel Hays Lowenstein, et al. *Election Law: Cases and Materials* 216 (6th ed. 2017)) ("*New Vote Dilution*").

[68] Steven J. Mulroy, *Baby & Bathwater: Standing in Election Cases after 2020*, 126 Dick. L. Rev. 9, 36 (2021). *See generally Reynolds v. Sims*, 377 U.S. 533 (1964).

[69] *Baker v. Carr*, 369 U.S. 186, 195, 207–08 (1962).

[70] *Id.* at 208.

[71] *In re U.S. Catholic Conf. (USCC)*, 885 F.2d 1020, 1028 (2d Cir. 1989).

[72] *See* 52 U.S.C.A. §§ 10301, *et seq. See also Brnovich v. Democratic. Nat'l Comm.*, 594 U.S. 647, 653–55, 659, 666–67 (2021) (noting that § 2(b) of the Act is codified in § 10301).

21

when it operates to 'cancel out or minimize the voting strength of racial groups.'"[73] Partisan gerrymandering resembles racial vote dilution but creates districts with reference to partisanship instead of race.[74] In each instance, unlike the plaintiffs' standing claim here, standing is grounded in the discrimination of the influence of the plaintiff's votes in relation to that of other voters.[75] We do not see, and the plaintiffs have not endeavored to explain, how their vote-dilution claim maps on to these more traditional applications of the theory.

Plaintiffs' vote-dilution claim more closely resembles a theory invoked in the spate of election challenges surrounding the 2020 election—what one scholar has described as "vote dilution through fraud facilitation."[76] Under that theory, it is alleged "[f]irst, [that] an overly lax voting rule induces electoral fraud. Second, the resulting fraud cancels out votes that are lawfully cast. Therefore, the overly lax policy is unconstitutional—dilutive of honest citizens' valid votes."[77] Here, of course, the plaintiffs do not allege that the Challenged Statutes are likely to induce

---

[73] *Thornburg v. Gingles*, 478 U.S. 30, 87 (1986) (O'Connor, J. concurring in the judgment) (quoting *White v. Regester*, 412 U.S. 755, 765 (1973)).

[74] *See, e.g.*, *Gill*, 585 U.S. 48, 60, 63, 66–67 (noting that "this Court has been repeatedly asked to decide what judicially enforceable limits, if any, the Constitution sets on the gerrymandering of voters along partisan lines" but distinguishing this type of claim from "racial gerrymandering[.]"). In *Rucho v. Common Cause*, 588 U.S. 684 (2019), the United States Supreme Court held that partisan gerrymandering claims presents political questions that are not justiciable, abrogating *Davis v. Bandemer*, 478 U.S. 109 (1986).

[75] *New Vote Dilution* at 1190–91.

[76] *Id.* at 1181.

[77] *Id.* at 1180.

22

electoral fraud. Even so, the federal cases addressing such claims serve to illustrate the weakness of the plaintiffs' vote-dilution allegation in this case.

In *Martel v. Condos*, five registered voters in Vermont sought injunctive and declaratory relief targeting a new mail-in voting law as unconstitutional, claiming that ballots would be mailed to "voters who have moved away, died, or otherwise become ineligible and that these ballots will be used to vote illegally by the ineligible voter or others[.]"[78] The district court concluded that, although a "vote cast by fraud or mailed in by the wrong person through mistake has a mathematical impact on the final tally and thus on the proportional effect of every vote,"[79] the plaintiffs failed to establish standing, because "[i]f every voter suffers the same incremental dilution of the franchise caused by some third-party's fraudulent vote, then these voters have experienced a generalized injury."[80]

When a campaign and a political party challenged a similar mail-in ballot measure in Nevada, the district court arrived at a similar conclusion. The plaintiffs claimed that the measure "'facilitate[d] fraud and other illegitimate voting practices' and 'dilute[d] the value of honest, lawful votes' in violation of the Fourteenth Amendment."[81] The court held that the political party did not have associational

---

[78] 487 F.Supp.3d 247, 250–51 (D. Vt. 2020).
[79] *Id.* at 253.
[80] *Id.*
[81] *Donald J. Trump for President, Inc. v. Cegavske*, 488 F.Supp.3d 993, 997–98 (D. Nev. 2020).

standing on behalf of its member voters because its members "would not 'otherwise have standing to sue in their own right.'"[82]  The political party cited studies and news articles relating to voter fraud, but the court, even accepting the allegations as true, found them to be insufficient.[83]  "Plaintiffs never describe[,]" the court observed, "how their member voters will be harmed by vote dilution where other voters will not[,]" which meant that the allegations were "'precisely the kind of undifferentiated, generalized grievance about the conduct of the government' that fail to confer Article III standing."[84]

In another 2020 case, this one filed in Georgia, a single registered voter initiated a post-general election challenge, alleging that state absentee-ballot and recount procedures violated federal law.[85]  He sought extraordinary relief, including that the certification of the election results be enjoined.  The district court dismissed the case for want of standing, and the Eleventh Circuit Court of Appeals affirmed, finding that the plaintiff had failed to allege an injury in fact.  In a passage of particular relevance here, the Court observed:

> Wood asserts only a generalized grievance.  A particularized injury is one that affect[s] the plaintiff in a personal and individual way.  For example, if Wood were a political candidate harmed by the recount, he would satisfy this requirement because he could assert a personal,

---

[82] *Id.* at 999–1000 (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). The campaign did not have associational standing either because it did not represent voters.  *Id.* at 999.

[83] *Id.* at 1000.

[84] *Id.* (quoting *Lance v. Coffman*, 549 U.S. 437, 522 (2007)).

[85] *Wood v. Raffensperger*, 981 F.3d 1307, 1310 (11th Cir. 2020).

distinct injury. But Wood bases his standing on his interest in ensur[ing that] . . . only lawful ballots are counted. An injury to the right to require that the government be administered according to the law is a generalized grievance. And the Supreme Court has made clear that a generalized grievance, not matter how sincere, cannot support standing.[86]

In reaching this conclusion, the Court dismissed the plaintiff's contention that the inclusion of unlawfully processed absentee ballots diluted the weight of his vote. Quoting the Third Circuit Court of Appeals decision in *Bognet v. Secretary Commonwealth of Pennsylvania*,[87] the Eleventh Circuit concluded that

no single voter . . . is specifically disadvantaged if a vote is counted improperly, even if the error might have a mathematical impact on the final tally and thus on the proportional effect of every vote. Vote dilution in this context is a paradigmatic generalized grievance that cannot support standing.[88]

For good measure, we mention one more opinion in which a claim of vote dilution was found wanting. A set of plaintiffs in Pennsylvania—a campaign, a political party, candidates, and electors—lacked standing to bring claims involving unmonitored ballot drop boxes, unverified signatures on mail-in ballots, and county-specific residency requirements for poll watchers.[89] For many of the plaintiffs' claims, the "theory of injury" was vote dilution. They feared that, in the absence of the security measures they were seeking (drop-box guards, signature comparisons of

---

[86] *Id.* at 1314 (citations and internal quotation marks omitted).
[87] 980 F.3d 336 (3d Cir. 2020), *vacated as moot*, *Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021)).
[88] *Wood*, 981 F.3d at 1314–15 (internal citation and quotation marks omitted).
[89] *Donald J. Trump for President, Inc. v. Boockvar*, 493 F.Supp.3d 331, 341–43, 376–82 (W.D. Pa. 2020).

mail-in ballots, poll watchers), voter fraud would ensue. And if another voter were to engage in fraud, according to the plaintiffs, their "lawfully cast vote[s] [would], by comparison, count for less[.]"[90] The district court rejected this theory of harm as "speculative, and thus . . . not 'concrete[.]'"[91] The court also spurned the plaintiffs' deployment of their vote-dilution theory in service of a "sort of Equal Protection claim":

> [D]espite their assertions, Plaintiffs have not actually alleged, let alone proven, that votes cast in some counties are diluted by a greater amount relative to votes cast in others. Rather, they have, at best, shown only that events causing dilution are more likely to occur in counties that use drop boxes. But, importantly, the effect of those events will, by Plaintiffs' own admission, be felt by every voter across all of Pennsylvania.[92]

In like manner, the plaintiffs in this case have not alleged that they will feel the dilutive effects, if any exist, of early and permanent-absentee voting any differently than will every voter across Delaware. Put differently, the plaintiffs' vote-dilution theory does not establish a particularized harm. And this failure is fatal to the plaintiffs' claim of voter standing.

ii

In reaching our conclusion that the plaintiffs do not have standing by virtue of their status as registered voters, we are mindful that, in *Higgin*, the Court of

---

[90] *Id.* at 342.
[91] *Id.*
[92] *Id.* at 387.

Chancery recognized "voter standing" under like circumstances. As mentioned earlier, *Higgin* involved challenges to vote-by-mail and same-day registration statutes. On appeal, we concluded that one of the plaintiffs had standing as an active candidate in an impending election; consequently, we were not compelled and chose not to address the trial court's voter-standing finding. Because the plaintiffs in this case rely—almost exclusively—on the Court of Chancery's voter-standing analysis in *Higgin*, we take this opportunity to address it here.

The Court of Chancery's standing analysis in *Higgin* is, to be sure, wide-ranging, so much so that it is difficult to discern whether it is grounded in traditional standing principles or, instead, on no less relevant but undoubtedly more nebulous "'discretionary and prudential'"[93] considerations. In its scholarly discussion, the court observed that voting is a fundamental right and that "[t]he constitutionality of laws that change [it] . . . [is] of great public importance."[94] The court found support for the notion that our state courts are not bound to follow the standards for evaluating standing to sue in federal court in the Delaware Constitution's "open courts" clause. That provision—found in Article I, § 9—guarantees that our "courts shall be open . . . and every person for an injury done him or her . . . shall have

---

[93] *Higgin v. Albence*, 2022 WL 4239590, at *10 (Del. Ch. Sept. 14, 2022) (quoting *In re Pub. Schs. Litig.*, 239 A.3d 451, 510 (Del. Ch. 2020)).
[94] *Id.*

remedy by the due course of law[.]"[95] The court then opined that "Delaware's permissive approach to standing is reinforced by its 'historic and constitutional separation of law and equity.'"[96] Adding to these considerations this Court's recognition of taxpayer standing in a 1977 opinion and "Delaware's willingness to recognize standing in cases involving public issues that affect all citizens,"[97] the court ruled:

> Plaintiffs' concerns raise more than voting dilution. They strike at the voting right itself. Plaintiffs, like all voters, have a right to participate in free and fair elections under which all votes legally made—and only votes legally made—count. Regardless of how laudable the purpose behind the Vote-by-Mail Statutes may be, the statute cannot introduce into the General Election votes prohibited under the Delaware Constitution. Plaintiffs adequately allege that it could. Accordingly, they have stated an injury in fact.[98]

This statement did not conclude the court's voter-standing analysis, yet we pause here to raise three concerns about the court's finding of injury in fact. First, it is unclear whether the court intended "voting dilution" to be a component of the plaintiffs' injury in fact; if it did, it left out any discussion of how the plaintiffs' votes were diluted in a way that harmed them.

Second, it is equally unclear how the court's statement that the "[p]laintiffs' concerns . . . strike at the voting right itself" bolstered the plaintiffs' standing as

---

[95] Del. Const. art. I, § 9.
[96] *Higgin*, 2022 WL 4239590, at *11 (quoting *Monroe Park v. Metro. Life. Ins. Co.*, 457 A.2d 734, 738 (Del. 1983)).
[97] *Id.* at *11.
[98] *Id*. at *12 (footnote omitted).

28

voters.[99]  The plaintiffs had not alleged that their right to vote as before had been impaired, only that, in some vague manner, their votes would be diluted.  They did not—and this relates to our third concern—allege in any substantial way that the dilution, if it would in fact occur, would harm them or frustrate their electoral objectives.  For these reasons, we find the court's reasoning in *Higgin* in support of its finding that the plaintiffs qua voters suffered an injury in fact unpersuasive.

Nor are we persuaded by the Court of Chancery's *Higgin* opinion that, even if we were to find that the plaintiffs were harmed by the dilution of their votes, the harm is sufficiently particular and concrete to confer standing.  We agree with the Court of Chancery that an injury that is shared with others can also be particular and concrete.  But it is problematic when the alleged injury is shared with *everyone else—here, every other voter*.[100]  In the absence of an allegation that the votes of electors who vote early or who have permanent-absentee status will harm the plaintiffs differently than it will affect other voters, the harm cannot fairly be seen as particular; its source is the plaintiffs' desire that other voters comply with our voting

---

[99] To be sure, we quoted this statement with approval but in the context of our review of Higgin's standing as an active candidate.

[100] That a grievance is shared widely by a class of voters is not *ipso facto* disqualifying.  For instance, a voter might have standing to challenge a measure that affects the political efficacy of her vote.  *See e.g., Michel v. Anderson*, 14 F.3d 623 (D.C. Cir. 1994) (Voters had standing to challenge a House of Representative rule allowing delegates from U.S. territories to vote thereby diluting the voting power of the voters' member of congress.).

laws as plaintiffs understand them. That is a paradigmatic generalized grievance and is insufficient to support a plaintiff's standing.[101]

Finally, we address the Court of Chancery's concern in *Higgin* that, "[i]f illegal voting laws do not cause particularized harm to voters, then no voter would ever have standing to challenge illegal elections."[102] Not so. The Department itself acknowledges that, had the plaintiffs alleged a particularized injury, "such as that their votes [will be] given less weight than other votes[,]" standing based on vote dilution might be established.[103] Moreover, the Court of Chancery's fear that, if we do not recognize voter standing in cases involving our election laws, no one will have standing to challenge them, was unwarranted, as this Court's decision in *Higgin* demonstrated.

In sum, we disagree with the Court of Chancery's voter-standing analysis in *Higgin*; in consequence, the plaintiffs' reliance on it in this case is unavailing. The plaintiffs have not shown that they will be disadvantaged by the casting of the putatively unconstitutional ballots any more than other voters will be. The injury

---

[101] *Lance*, 549 U.S. at 441–42 (citation omitted) ("The only injury plaintiffs allege is that the law—specifically the Elections Clause—has not been followed. This injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past. It is quite different from the sorts of injuries alleged by plaintiffs in voting rights cases [e.g., *Baker*] where we have found standing.").

[102] *Higgin*, 2022 WL 4239590, at *13.

[103] Reply Br. at 9.

they alleged as voters is generalized and, as such, is insufficient to establish their standing.

## IV

We reverse the Superior Court's February 23, 2024 Opinion, vacate its declaratory judgment, and dismiss the amended complaint for lack of standing. The Department may conduct all primary, general, and special elections in 2024 in accordance with the Challenged Statutes.

**VALIHURA, J., Concurring:**

I agree with this Court's conclusions that Senator Hocker did not satisfy the requirements for standing as a candidate and that Mennella's status as an election inspector does not aid him in satisfying the elements of standing either. I part company with my learned Colleagues on their discussion of registered voter standing because I believe that my Colleagues' discussion of registered voter standing goes beyond what is needed to resolve this case.

"'Standing' refers to the right of a party to invoke the jurisdiction of a court to enforce a claim or redress a grievance."[1] "'Standing is a threshold question that must be answered by a court affirmatively to ensure that the litigation before the tribunal is a 'case or controversy' that is appropriate for the exercise of the court's judicial powers.'"[2] Standing is concerned "only with the question of *who* is entitled to mount a legal challenge and not with the merits of the subject matter of the controversy."[3]

Our Court recently summarized the requirements of standing under federal law in *Employers Insurance Company of Wausau v. First State Orthopaedics, P.A.*:

> Under Article III of the United States Constitution, a plaintiff bears the burden of proving standing, which includes three prongs. First, the plaintiff must allege an injury in fact, which is both concrete and actual or imminent. An actual or imminent injury is one that is neither hypothetical nor conjectural. Second, the plaintiff must show that the injury is caused by the defendant's actions. A plaintiff can meet this prong by demonstrating that

---

[1] *Albence v. Higgin*, 295 A.3d 1065, 1085 (Del. 2022) (citing *Dover Hist. Soc'y v. City of Dover Plan. Comm'n*, 838 A.2d 1103, 1110 (Del. 2003)).

[2] *Id.* at 1085–86 (quoting *Riverfront Hotel LLC v. Bd. of Adjustment of City of Wilmington*, 213 A.3d 89, 2019 WL 3884031, at *1 (Del. 2019) (TABLE)).

[3] *Stuart Kingston, Inc. v. Robinson*, 596 A.2d 1378, 1382 (Del. 1991) (emphasis in original).

the injury is "fairly traceable" to the defendant's "complained-of conduct." And third, the plaintiff must show that their requested relief is likely to redress the injury. We generally follow Article III's standing requirements.[4]

Delaware law does not strictly mirror the federal law of standing: "[u]nlike the federal courts, however, where standing may be subject to stated constitutional limits, we apply the concept of standing as a matter of self-restraint to avoid the rendering of advisory opinions at the behest of parties who are 'mere intermeddlers.'"[5] Because the authority of state courts is derived from the "plenary and unenumerated powers of state sovereignty[,]"[6] "Delaware's courts may hear cases and controversies that the federal courts cannot."[7]

My Colleagues conclude that voter standing fails because it is based upon a dilution theory where Plaintiffs have failed to demonstrate any particularized harm. There are well-established scenarios where courts have recognized standing based upon vote dilution. Such cases include malapportionment, racial vote dilution, and partisan gerrymandering

---

[4] *Emp'rs Ins. Co. of Wausau v. First State Orthopaedics, P.A.*, 312 A.3d 597, 607–08 (Del. 2024) (internal citations omitted); *see also Bognet v. Sec'y Commonwealth of Pennsylvania*, 980 F.3d 336, 348 (3d. Cir. 2020), *vacated as moot*, *Bognet v. Degraffenreid*, 141 S.Ct. 2508 (2021) ("The familiar elements of Article III standing require a plaintiff to have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.") (internal quotation marks and citations omitted).

[5] *Higgin*, 295 A.3d at 1086 (quoting *Dover Hist. Soc'y*, 838 A.2d at 1111) (internal quotation marks omitted). *See also ASARCO Inc. v. Kadish*, 490 U.S. 605, 617 (1989) ("We have recognized often that the constraints of Article III do not apply to state courts, and accordingly the state courts are not bound by the limitations of a case or controversy or other federal rules of justiciability[.]").

[6] *Higgin*, 295 A.3d at 1086 (internal citation omitted).

[7] *Id.* at 1086–87 (internal citation omitted). *See also Reeder v. Wagner*, 974 A.2d 858, 2009 WL 1525945, at *2 (Del. 2009) (TABLE) ("Even absent the showing of a particularized injury . . . this Court has recognized in certain cases that a plaintiff may have standing, as a taxpayer, to enjoin the unlawful expenditure of public money or the misuse of public property.") (internal citation omitted).

2

cases.  In *Baker v. Carr*,[8] for example, the U.S. Supreme Court found standing where the plaintiffs had alleged that the votes in more heavily populated districts carried less mathematical weight than the votes of other citizens.  But in *Lance v. Coffman*,[9] the Supreme Court held that voters lacked standing because the only alleged injury was that the U.S. Constitution's Elections Clause had not been followed.[10]  The Court in *Lance* reasoned that the alleged harm was "precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past."[11]  One commentator has explained the dividing line as follows:  "[w]here plaintiffs merely assert an interest in seeing that the law is correctly followed, they will lack standing.  But where plaintiffs can assert that the alleged illegality will actually dilute the weight carried by their votes, they will have standing."[12]  It appears that the weight of developing federal authority leans heavily towards courts rejecting voter standing based on a vote dilution theory where the sole contention is that some voters were permitted to cast

---

[8] 369 U.S. 186 (1962).

[9] 549 U.S. 437 (2007).

[10] The U.S. Constitution delegates to state legislatures the authority to regulate the "Times, Places and Manner of holding Elections for Senators and Representatives[ ]" subject to Congress's ability to "make or alter such Regulations[.]"  U.S. Const. art. I, § 4, cl. 1.  This is known as the "Elections Clause."

[11] *Lance*, 549 U.S. at 442; *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573–74 (1992) ("We have consistently held that a plaintiff raising only a generally available grievance about government — claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large — does not state an Article III case or controversy.").

[12] Steven J. Mulroy, *Baby & Bathwater: Standing in Election Cases After 2020*, 126 Dickinson L. Rev. 9, 37–38 (2021).

allegedly illegal ballots.[13]  Thus, at least the federal precedent suggests that Plaintiffs' claim is insufficient.

Although the law in Delaware is less well developed, given the skeletal nature of Plaintiffs' vote dilution claim here, I agree that it is insufficient under Delaware law as well.  Plaintiffs here did not allege impairment to the voting right itself or anything beyond a general, unparticularized assertion that they were "harmed as Delaware voters because their votes would be diluted by illegally cast ballots."[14]  Accordingly, I agree with the following portion of my Colleagues' discussion of registered voter standing:

> The plaintiffs' attempt to identify a concrete harm that they will suffer as voters should the Challenged Statutes stand — and thus their standing as registered voters — is confined to a single sentence (stated twice) in the amended complaint: "*Plaintiffs are also harmed as Delaware voters because their votes would be diluted by illegally cast ballots*."
>
> . . . .
>
> Our review of the plaintiffs' vote-dilution claim is constrained by their minimalist description of how the Challenged Statutes dilute their vote.  They do not allege that their votes would count less than the votes of other electors.  Neither do they allege that the electors who choose early voting or request permanent-absentee status under the Challenged Statutes would not, in the absence of those statutes, vote in person on election day.  Nor do the plaintiffs explain how voting under the Challenged Statutes compromises the political

---

[13] *See Lutostanski v. Brown*, 88 F.4th 582, 586 (5th Cir. 2023) ("First, the asserted injury is not concrete for purposes of Article III injury in fact . . . .  Here, the plaintiffs seem to argue that their right to vote was denied because the Travis County officials' use of an uncertified voting system invalidated their votes.  But plaintiffs' theory would apply equally to all voters in Travis County.  And plaintiffs do not allege that Travis County's voting system somehow invalidated their votes while counting more than 600,000 others.").  *See also* Mulroy, *Baby & Bathwater*, *supra*, at 42 n.175 (collecting cases).  The outcome would be different, though, if a candidate were the plaintiff. *See Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020).

[14] A24 (Compl. ¶ 63).  *See also* Mulroy, *Baby & Bathwater*, *supra*, at 43–44 (positing that alleged ballots that disproportionately disadvantage one party's candidates over another might satisfy voter standing requirements).

efficacy of their votes. The plaintiffs allege — only in a conclusory fashion, and then only as it relates to Hocker's purported standing as a candidate for election — that early voting or voting by an elector with "permanent absentee" status will lead to an unfair election if voting under the Challenged Statutes is allowed. These pleading deficiencies, standing alone, would be sufficient to warrant dismissal of the plaintiffs' complaint for lack of standing.[15]

That is where I believe the discussion should end. But my Colleagues go on to say that "[P]laintiffs' claim to standing as registered voters is deficient for other reasons as well."[16] In dicta, they then express accord with various cases concerning the 2020 election that were dismissed on standing grounds where a variety of other types of allegations were raised, including allegations of fraudulent and improper election conduct.[17] Those federal cases were not addressed in the presentations before our Court.[18] The parties here have not weighed in on how the treatment of voter standing depends on the types of underlying claims asserted or the relevance of those cases to the issues presented here.

Nor am I prepared to join in my Colleagues' criticisms of the Court of Chancery's discussion of "voter standing" in *Higgin* as I think the Vice Chancellor has made some

---

[15] *Majority Opinion* at 19–21 (emphasis added).

[16] *Id.* at 21.

[17] One commentator has noted that there were at least 60 such cases arising out of the 2020 election that raised a myriad of issues. Mulroy, *Baby & Bathwater*, *supra*, at 11. Nearly all were dismissed — many on standing grounds for various reasons. *Id.* at 11–13.

[18] The Majority discusses five 2020 elections cases: *Martel v. Condos*, 487 F.Supp.3d 247 (D. Vt. 2020); *Donald J. Trump for President, Inc. v. Cegavske*, 488 F.Supp.3d 993 (D. Nev. 2020); *Wood v. Raffensperger*, 981 F.3d 1307 (11th Cir. 2020); *Bognet v. Sec'y Commonwealth of Pennsylvania*, 980 F.3d 336 (3d Cir. 2020), *vacated as moot*, *Bognet v. Degraffenreid*, 141 S.Ct. 2508 (2021); *Donald J. Trump for President, Inc. v. Boockvar*, 493 F.Supp.3d 331 (W.D. Pa. 2020). The only case cited by either party in their briefs is *Bognet*. Appellants cite to *Bognet* in their opening brief but do not discuss it. *See* Opening Br. at 20. The other cases were neither cited nor discussed.

valid points that are worthy of more in-depth consideration. Much of the Vice Chancellor's decision focused on concerns *other than* vote dilution. As the Vice Chancellor said, the plaintiffs' concerns were aimed "at the voting right itself."[19] The Majority asks what it meant by this phrase.[20] I think implicit in the Vice Chancellor's statement is a sentiment that this Court articulated on appeal in *Higgin* — that the voters themselves were the direct objects of the challenged statutes which directly and allegedly adversely affected their right (embedded in our Delaware Constitution) to a free and fair election.[21]

In the course of finding that candidate Higgin had standing, we implied in our opinion in *Higgin* that the direct objects of a statute (electors and registrants) also could have standing. We said:

> In [*Lujan v. Defenders of Wildlife*] Justice Scalia observed that "[w]hen . . . the plaintiff is himself an object of the action (or forgone action) at issue . . . there is ordinarily little question" that he has standing. *To be sure, a fair point could be made that the direct objects of the Vote-by-Mail Statute and Same-Day Registration Statute are the electors and registrants, and not the candidates for whom they might vote.* But to ignore that the ultimate objects of our elections are the elected, as well as the defeated, would be to turn a

---

[19] *Higgin v. Albence*, 2022 WL 4239590, at *12 (Del. Ch. 2022), *aff'd in part rev'd in part*, *Albence v. Higgin*, 295 A.3d 1065 (Del. 2022).

[20] In our decision on appeal, we did agree with the Court of Chancery that Higgin's concerns went beyond a claim of voting dilution. *Higgin*, 295 A.3d at 1087. We also commented that, "[t]hey 'strike at the voting right itself' and the tenet that 'only votes legally made — count.'" *Id.* (quoting *Higgin*, 2022 WL 4239590, at * 12).

[21] As the Vice Chancellor further explained:

> To be sure, there are sound practical reasons counseling against granting standing to a plaintiff who bases a challenge to state action unrelated to voting on the sole fact that the plaintiff is a voter. This decision does not suggest otherwise. But when the challenge is directed to laws governing voting itself, the analysis is different. In the latter setting, meritless challenges can be addressed on the merits.

*Higgin*, 2022 WL 4239590, at *14 (internal citation omitted).

6

blind eye to the reality that those most immediately affected — and harmed by an inaccurate vote count — are those running for office.[22]

In that passage in *Higgin*, we cited *Michel v. Anderson*[23] as persuasive authority. *Michel* adds the following:

> That an injury is widespread, however, does not mean that it cannot form the basis for a case in federal court so long as each person can be said to have suffered a distinct and concrete harm . . . . The Supreme Court has repeatedly held that voters have standing to challenge practices that are claimed to dilute their vote, such as being placed in a voting district that is significantly more populous than others . . . . To be sure, in this case the alleged dilution occurs after the voters' representative is elected, and so *amici* argue that the voters' claim is "derivative." But we do not understand why that should be of significance. It could not be argued seriously that voters would not have an injury if their congressman was not permitted to vote at all on the House floor. That all voters in the states suffer this injury, along with the appellants, does not make it an "abstract" one.[24]

These passages in *Michel* (and cited by our Court in *Higgin*) align with what the Vice Chancellor wrote in *Higgin* that "[t]he mere fact that an injury is felt by many does not make the injury abstract."[25] As the Vice Chancellor further reasoned:

> If illegal voting laws do not cause particularized harm to voters, then no voter would ever have standing to challenge illegal elections.[26]

---

[22] *Higgin*, 295 A.3d at 1088 (emphasis added) (internal citations omitted) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). In Delaware, plaintiffs must demonstrate that the interests they wish to vindicate are "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Id.* at 1086 (internal quotation marks and citation omitted). *See, e.g.*, *Gannett Co., Inc. v. State*, 565 A.2d 895, 897 (Del. 1989); *Oceanport Indus., Inc. v. Wilmington Stevedores, Inc.*, 636 A.2d 892, 904 (Del. 1994) ("A party who is required to show an injury in fact, and that such injury is within the zone of interest sought to be protected by the statute, clearly comes within the purview of these statutes.").

[23] 14 F.3d 623 (D.C. Cir. 1994).

[24] *Id.* at 626.

[25] *Higgin*, 2022 WL 4239590, at *12 (internal citation omitted).

[26] *Id.* at *13.

. . . .

> Voting rights are plainly within the zone of interest implicated by the Vote-by-Mail Statute and the Delaware Constitution. Defendants do not contend otherwise.[27]

There seems to be little disagreement that registered voters are the direct objects of the challenged statutes and are within the "zone of interest" protected by the Delaware Constitution guaranteed of free and fair elections. But it is unclear what significance this fact has in the overall analysis of voter standing and this is not an issue that has been addressed in this appeal.[28]

Citing to our Delaware Constitution, the Vice Chancellor in *Higgin* pointed out that Delaware voters "have a right to participate in free and fair elections under which all votes legally made — and only votes legally made — count."[29] There is much force to the argument that a "statute cannot introduce into the General Election votes prohibited under the Delaware Constitution."[30] As the Court of Chancery observed on another occasion, "the right to vote in a free and equal election is not simply a right enshrined in Delaware's Constitution; it is the fundamental right on which our democracy rests."[31] The Vice

---

[27] *Id.* (internal citation omitted).

[28] As Justice Scalia observed in *Lujan*, the "concrete injury" requirement can have separation of powers significance as well: "'The province of the court . . . is, solely, to decide on the rights of individuals.' Vindicating the *public* interest (including the public interest in Government observance of the Constitution and laws) is the function of Congress and the Chief Executive." *Lujan*, 504 U.S. at 576 (quoting *Marbury v. Madison*, 5 U.S. 137, 170 (1803)).

[29] *Higgin*, 2022 WL 4239590, at *12 (internal citation omitted); *see also* Del. Const., art I, § 3 ("All elections shall be free and equal.").

[30] *Higgin*, 2022 WL 4239590, at *12.

[31] *League of Women Voters of Del., Inc. v. Dep't of Elections*, 250 A.3d 922, 925 (Del. Ch. 2020).

Chancellor reasoned that "[i]f illegal voting laws do not cause particularized harm to voters, then no voter would ever have standing to challenge illegal elections."[32] Although generalized grievances typically defeat standing, the widely-shared nature of an injury does not always render it abstract. In other words, a shared injury can still be particularized and concrete.[33] The Majority states that even if Plaintiffs had adequately alleged that they were harmed by dilution of their votes, the harm still would not be sufficiently particular and concrete to confer standing. Again, this appears to be an issue of first impression as a matter of Delaware law. The vital role of voting in our representative form of government makes the issue one of significant public importance. As the Vice Chancellor in *Higgin* observed, "[l]aws that permit citizens to vote in a manner inconsistent with our Constitution harm a citizen's basic right to elect representatives of her choosing."[34]

There are important aspects of our Delaware Constitution that are unique such as our Article I, § 9 which guarantees that our "courts shall be open . . . and every person for an injury done him or her . . . shall have remedy by the due course of law[.]"[35] Our Delaware Constitution also requires that violations of state constitutional rights have a

---

[32] *Higgin*, 2022 WL 4239590, at *13.

[33] *Dover Hist. Soc'y*, 838 A.2d at 1113.

[34] *Higgin*, 2022 WL 4239590, at *14.

[35] Del. Const. art. I, § 9.

remedy.[36]   There may be other features of our Delaware history and law that warrant a finding that our voter standing doctrine is more expansive than our federal counterpart.[37]

We did not address any of these important "voter standing" points when the *Higgin* case was before us because we found that standing existed on other grounds.[38]   Thus, we were spared a deep dive into these murky waters.   Rather than reject the Vice Chancellor's careful reasoning on "voter standing," we should reserve judgment on these issues of voter standing until they are fairly presented to us in a future case.[39]

In sum, I believe that the highly expedited nature of this proceeding counsels for a narrower holding that identifies and reserves for another day a more careful delineation of the boundaries of registered voter standing.  For these reasons, I respectfully concur in the judgment of this Court but do not join in its reasoning entirely as to voter standing.

---

[36] *See Garnett*, 308 A.3d at 655 (Valihura, J. dissenting).

[37] Generally, where a litigant wishes to argue that the Delaware Constitution confers rights that are more expansive than in the U.S. Constitution, our Court has required that a particularized showing be made to justify a departure from federal precedent.  *See, e.g.*, *Lloyd v. State*, 292 A.3d 100, 110 n.48 (Del. 2023) (citing *Ortiz v. State*, 869 A.2d 285, 291 n.4 (Del. 2005) ("stating that the proper presentation of an alleged violation of the Delaware Constitution should include a discussion and analysis of one or more of the following criteria:  textual language, legislature history, pre-existing state law, structural differences, matters of particular state interest [or] local concern, state traditions, and public attitudes or other applicable criteria.")); *see also Garnett v. State*, 308 A.3d 625, 659 (Del. 2023) (Valihura, J., dissenting) ("[T]here are several areas of law where Delaware has granted more expansive rights than the U.S. Constitution."); *id*. at 660 ("[O]ur Court has held that Article I, § 6 grants broader protection than the Fourth Amendment in several areas.") (internal citation omitted).  Such an approach to these voter standing issues may be worthy of consideration.

[38] *See Higgin*, 295 A.3d at 1088, n.157.

[39] Although not alleged in their Amended Complaint, Plaintiffs refer to the Vice Chancellor's "voting right impairment" theory in a short discussion encompassing two and one half pages in their Answering Brief.  Answering Br. at 24–25.  The State Officials' response covered a single paragraph in their Reply Brief.  Reply Br. at 9.  Voter standing is addressed in one paragraph in the Opening Brief.  Opening Brief at 20.